Maurice **PROCTOR**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 96–CF–107.

District of Columbia Court of Appeals.

Argued Sept. 17, 1998.

Decided May 13, 1999.

Thomas D. Engle, appointed by the court, with whom Sharon L. Burka and Quinn O'Connell, Jr. were on the brief, for appellant.

Robin C. Ashton, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas C. Black and Kenneth L. Wainstein, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN and RUIZ, Associate Judges, and NEWMAN, Senior Judge.

STEADMAN, Associate Judge:

This appeal reaches us after the retrial of appellant Maurice Proctor resulted in Proctor's conviction for first-degree murder while armed, premeditated, in violation of D.C.Code §§ 22–2401, –3202.[1] The only issue on appeal is a challenge to the trial court's pretrial ruling admitting evidence that a lie detector test—more precisely put, a test by a computerized voice stress analyzer (CVSA)—had been administered to the prosecution's main witness. We conclude in the circumstances here that the judgment of conviction must be reversed and the case remanded for a new trial.

## I.

### A.

At the second trial, the following evidence was presented. Rodney Brown was fatally stabbed five times in the early morning hours in front of a Georgia Avenue Amoco gas station on June 15, 1994. Earlier that day, Brown had been drinking and talking with neighbors and friends in front of appellant Proctor's apartment at 610 Irving Street, the same apartment that housed Rodney Brown's girlfriend Cynthia Williams. Brown participated in several arguments in front of 610 Irving Street that evening. His first altercation was with Cynthia Williams. During the course of the dispute, Brown tossed a beer into Cynthia Williams's face. Subsequently, Roy Williams, Cynthia's brother, admonished Brown for disrespecting Cynthia. That argument escalated into a fistfight during which Roy Williams fell or was pushed down the stairs in front of the apartment and received a gash on his forehead. Thereafter, appellant Proctor arrived on the scene, and, witnessing the squabble, demanded that the parties quiet down so as not to disturb his grandmother, who was in an upstairs apartment. Rodney Brown, still riled,

---

1. Proctor had been previously tried by a jury which was unable to reach a unanimous verdict.

allegedly responded, "F—— your grandmother!"

Later that same evening, Metropolitan Police Officers Brian Gibson and Daniel Hickson were handling a disorderly conduct call on Lamont Street when they observed someone yelling and running down Georgia Avenue. Another individual was pursuing that man on foot, and a blue vehicle appeared to be keeping pace right behind the chase. By the time the officers were able to catch up to the parties, Brown was at the Amoco station, suffering from stab wounds and unable to speak. The blue car was observed parked nearby, with an individual crouching by the passenger door. The crouching individual ran away when the officers attempted to apprehend him. Brown died shortly thereafter.

The defense theory in the case was one of misidentification; the defense argued that Roy Williams was more likely to have been the stabber.

In addition to circumstantial evidence linking Proctor to the owner of the blue car,[2] the prosecution offered four eye-witnesses to the Amoco scene: both police officers, Gibson and Hickson; a neighbor, Donald Hymes; and the Amoco station manager on duty that night, Steven Avery. The two officers were unable to make a positive identification of the perpetrator,[3] and Donald Hymes was impeached by (1) his associations with the parties; (2) the fact that he had been drinking steadily for about eleven hours on the night in question; and (3) inconsistencies between the testimony he gave in the two trials. Thus, of all prosecution witnesses, Avery was especially significant.

On the scene, Avery initially denied witnessing the stabbing to lead detective Gregory, claiming that he was in the bathroom during the crime. The prosecution issued Avery a subpoena the following day, and he again denied any witnessing of the incident. Then, one day later, after talking with his mother and his employer about the events, he approached the prosecutors himself to "come clean" about his viewing of the incident, and gave a basic description of the suspect as a medium complected black male about six feet tall. He was summoned by detectives again, approximately three weeks later, on July 8, 1994 to view a photo spread. Avery told the detectives he had seen the left side of the perpetrator's face as he fled the scene of the crime. Nonetheless, Avery stated he was unable to identify the perpetrator out of the photo spread shown to him at that time. Several months later, on October 4, 1994, prosecutors approached Avery again and requested that he view the same photo array while under a computerized voice stress analyzer (CVSA). During the three viewings of the photos, required as basic procedure for administration of a CVSA, Avery continued to assert he could identify no one. Detective Gregory then, in Avery's words, "told me the results—told me basically the last—they still feel I'm nervous, I'm still holding back information."[4] After this suggestion as well as a sympathetic conversation about their shared North Carolina roots, Avery proceeded to look through the photo array a final time. This time, he identified the appellant.

### B.

Prior to opening statements in the second trial, the prosecution approached the bench about the admissibility of the CVSA test. During that bench conference, the prosecution observed that at the first trial, the defense had argued that Avery's identification of Proctor was the result of extreme pressure from the prosecutors, who repeatedly challenged Avery's story. As part of this

---

2. Neighbors gave descriptions of a similar car belonging to an acquaintance of Proctor, and testified that Proctor had been seen riding in this friend's car on several occasions. Proctor's fingerprints were found on the car, though not on the passenger door where the presumed perpetrator had been crouching just after the crime.

3. Both officers asserted they had seen the perpetrator but were uncertain of their ability to iden-

tify him. Nonetheless, both Gibson and Hickson proceeded to select an individual from the photo spread provided to them, and in each case they selected an individual other than the appellant.

4. On direct examination, in response to the question "did you tell him [Avery] that he'd been deceptive?" Detective Gregory answered, "Yes, I did."

argument, the defense had noted that Avery was shown the same photo spread four times in a single day, and only modified his story about his ability to identify someone on his final viewing. Although the prosecution had sought to introduce administration of the CVSA test as the reason Avery changed his story, the judge in the first trial, Henry F. Greene, had forbidden any mention of the test.

The prosecution argued that its hands had been tied in the first trial because it could not explain why Avery was shown the photo array four times. Appellant indicated that he would again be impeaching Avery's credibility and suggesting police coercion in the new trial. On this basis, the prosecution argued that the defense had "opened the door" to full disclosure of the administration, though not the results, of the lie detector test. Appellant continued to argue for exclusion of such evidence, and offered to tailor his defense so as to minimize the prejudice to the government that might arise from discussion of the serial showings of the photographs. After considerable further discussion, the judge ruled that the CVSA evidence would be admissible not to prove truth or falsity but to set forth the circumstances of Avery's change of story.[5]

## II.

For almost eighty years, courts in this jurisdiction have repeatedly ruled lie detector evidence to be inadmissible.[6] The seminal

case, *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923), disallowed such evidence as not "sufficiently established to have gained general acceptance in the particular field in which it belongs."[7] Our own case law has consistently reflected an aversion to lie detector evidence. For example, in *Smith v. United States*, 389 A.2d 1356 (D.C.1978), the defendant attempted to introduce testimony by an examiner concerning the results of a polygraph examination of the appellant. The court upheld the trial judge's refusal to admit polygraph evidence, and justified its holding on the peculiarly prejudicial nature of such evidence: "Because of the authoritative quality which surrounds expert opinion, courts must reject testimony which might be given undue deference by jurors and which could thereby usurp the truthseeking function of the jury." *Smith, supra*, 389 A.2d at 1359 (D.C.1978) (citing *Douglas v. United States*, 386 A.2d 289, 295 (D.C.1978)).

*Smith* involved admissibility of the results of lie detector tests to test credibility. But our recent case law demands a conservative approach to the use of lie detector evidence in any context. *Mitchell v. United States*, 569 A.2d 177 (D.C.1990), upholding a trial judge's refusal to allow lie detector evidence, noted: "The judge determined that the introduction of even the words 'lie detector' would be so prejudicial and inflammatory that it outweighed its probative value." *Id.* at 185. The most recent lie detector case in our

---

5. The court in its final instructions told that jury with respect to the CVSA test: "Test results of that nature are inadmissible in courts of law. They are deemed to be insufficiently reliable. Evidence of what the police officers may have told Mr. Avery was admitted for the sole purpose of showing what if any effect that evidence may have had on Mr. Avery's action. You're instructed that you may not consider that evidence regarding a voice stress analyzer test for any other purpose."

6. For ease of reference, we use the term "lie detector" in a perhaps imprecise manner to describe truth-seeking devices generally. It is relevant to note that in this case, the "lie detector" was not the traditional polygraph of *Frye* dependent upon systolic blood pressure, but the relatively modern CVSA, which lacks the polygraph's track record. Our own court has expanded the prohibition on polygraphs as substantive evi-

dence to include CVSAs. *Contee v. United States*, 667 A.2d 103, 104 n. 4 (D.C.1995) (per curiam).

7. Just last year, the Supreme Court observed that "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *United States v. Scheffer*, 523 U.S. 303, ——, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413, 419 (1998). However, the traditional outright ban on lie detector tests seems to have been somewhat affected by advances in polygraph technology and significant use of the technique in business and government. *See* 1 JOHN WILLIAM STRONG, ET. AL., McCORMICK ON EVIDENCE § 206 at 912–13 (4th ed.1992). In any event, no foundation has been laid in this case for any such reconsideration of the rule. *Cf. Green v. United States*, 718 A.2d 1042, 1049–55 (D.C.1998) (possible admissibility of expert testimony on eyewitness identifications).

court, *Peyton v. United States,* 709 A.2d 65 (D.C.1998), reflects a like view of such evidence, "for even an indirect reference to the administration of a polygraph examination has a substantial potential for prejudice." *Id.* at 65.[8] That same case included a quotation labeling lie detector evidence as having the "status of a pariah." *Id.* at 70 n. 13 (quoting *State v. Hawkins,* 326 Md. 270, 604 A.2d 489, 492 (1992)).[9]

To be sure, there is authority that in certain limited circumstances, the fact of the administration of such a test (without submitting actual test results to prove or disprove veracity) may be admissible to shed light on someone's behavior. The D.C. Circuit, in a case binding on us,[10] recognized this difference many years ago in *Tyler v. United States,* 90 U.S.App.D.C. 2, 193 F.2d 24 (1951). In that case, the defendant Tyler testified on his own behalf and alleged that his confession was the result of police brutality and coercion. The prosecution advanced testimony that Tyler had consented to a polygraph exam, and had insisted it would prove his innocence, but that when he was confronted with the negative results of the test, Tyler confessed voluntarily. The trial court denied the defense's motion to strike this testimony because it found the evidence "relevant as revealing circumstances leading to the confession, although not as proof of the correctness of [the prosecution expert's] statement" that Tyler had lied. *Id.* at 31. The trial court immediately instructed the jury as to the limited permissible use of the evidence. Based on the perceived necessity of the evi-

dence to address the allegations of police coercion, and the jury instruction to view the evidence not for its substance but for its relevance to the question of the voluntariness of the confession, the Circuit Court affirmed. *Id.* at 31.

We are not aware of any "opening the door" lie detector cases in our own jurisdiction subsequent to *Tyler.* Elsewhere, where followed, the analysis of *Tyler* has been limited to circumstances in which lie detector evidence is made necessary because of actions taken by the defense that "open the door" to its introduction. Actions that constitute opening the door warranting remedial lie detector evidence from the prosecution have included accusations of sloppy detective work, *United States v. Hall,* 805 F.2d 1410 (10th Cir.1986), as well as accusations of police coercion of a defendant, *United States v. Kampiles,* 609 F.2d 1233 (7th Cir.1979), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980); *United States v. Johnson,* 816 F.2d 918 (3d Cir.1987). In each of these cases, the evidence admitted was the fact of administration of a lie detector test to the defendant.

Thus, acute awareness of the potential prejudicial nature of lie detector evidence, even when admitted for reasons other than proving a statement true or false, is a hallmark of a decision concerning its possible use. "Where viable alternatives do exist, it is deceptive to rely on the pursuit of truth to defend a clearly harmful practice." *Bruton v. United States,* 391 U.S. 123, 134, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). And, as with

---

8. Other jurisdictions likewise have found substantial problems with references to lie detectors, even when results are not explicitly disclosed. Most notably, a Pennsylvania case presented a factual scenario similar to the one we face here. The prosecution introduced the administration of a polygraph exam in an attempt to rehabilitate a witness who had been impeached because he had changed his story within a week, after he spent time with police officers. The Supreme Court of Pennsylvania held that the mention of the test "unavoidably raised an inadmissible inference of the test result," and further that "the inference carried the weight of scientific evidence while in fact that evidence was unreliable." *Commonwealth v. Johnson,* 441 Pa. 237, 272 A.2d 467, 469 (1971). The court concluded that "The same considerations that require excluding express discussion of the test result require excluding the

instant reference." *Id.* at 469. The court's reasoning was based in part on the unavoidable, and possibly incurable, inference of the result and its impact on credibility the jurors were bound to make: "the charge of the trial court instructing the jury to limit its considerations strictly to the fact that the test had been administered could not remove the prejudice." *Id.* at 470.

9. In both *Hawkins* and *Peyton,* the court went on to rule that not every reference to a lie detector test ipso facto warrants reversal. In *Peyton,* reversal was avoided because the polygraph reference was brief, spontaneous and immediately rectified by the trial judge's stern instructions.

10. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971).

any discretionary decision, the trial court should defer final consideration until it is fully versed as to all the facts and circumstances. *Johnson v. United States*, 398 A.2d 354 (D.C.1979).

▆▆▆ From this review of the admissibility of lie detector evidence, several conclusions can be drawn with respect to the discretionary decision as to admissibility of evidence under the theory of opening the door.[11] *See Kampiles, supra,* 609 F.2d at 1244. The starting point for any such ruling must be the *Frye* holding, reasserted without deviation by our cases, that the results of a lie detector test are, without more, inadmissible to prove the truth or falsity of an assertion. Evidence not directly bearing on that issue but which indirectly reveals the results must be treated with extreme caution. Any decision as to the admissibility of such evidence on an opening the door theory should be deferred as long as feasible, and "viable alternatives" to the admission of such prejudicial evidence should be fully explored.[12] In light of these principles, we turn to the ruling before us.

### III.

Reviewing the record in light of the above principles, we conclude that the trial court's exercise of discretion here was flawed in three significant ways, that the error was not harmless, and that reversal is thus required.

First, the analysis of the trial court in approving, pretrial, evidence about the administration of the CVSA test seems in large part to have rested on its view that the evidence about the lie detector test that was admitted (i.e., that it was administered, not its results) did not bear upon the material issue that the jury had to decide and hence there was no significant unfair prejudice to appellant in admitting the evidence simply to show how Avery came to change his position. The trial court conceived of the material issue as being whether to credit Avery's subsequent identification of appellant individually from the photo array.

▆▆▆ We agree with appellant that this was too crabbed a view. The heart of appellant's case was that Avery's statement that he could not identify anyone from the array was in fact the truthful statement. Although it is true that the results of the test were not expressly described, no juror hearing all the evidence could have failed to conclude that the results indicated that this prior position of Avery was false. We think that the trial court was obligated to view this matter through the prism of lie detector evidence bearing upon a material issue and potentially prejudicial to that full extent.[13] In not doing so, the trial court was misapprised as to a highly relevant factor, and its decision thus was necessarily affected by an inadequate appreciation of the question of prejudice. *Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979).

Second, perhaps because of its view of the relative lack of prejudice, the trial court failed to consider whether anything less than unrestricted evidence of the facts relating to administration of the CVSA test might suffice to meet the legitimate concerns of the prosecution. Early in the course of discussion, appellant specifically raised the possibility of modifying his prior approach that supposedly would open the door to the lie detector evidence:

11. The government relies in its brief on our recent decision in *Peyton, supra,* to determine the scope of discretion allowed the trial judge. In that case, however, the issue was not a ruling on admissibility of lie detector evidence, but the granting of a mistrial in light of what was acknowledged as an inappropriate reference by a witness to such evidence. Trial courts receive particularly great deference in determining whether to grant a mistrial as relief. *Lee v. United States*, 562 A.2d 1202, 1204 (D.C.1989). *Peyton* went on to outline factors determining whether an erroneous reference to lie detector evidence might be considered harmless, a test that we apply here to an erroneous decision to admit such evidence. See *infra.*

12. *See United States v. Young*, 470 U.S. 1, 11–14, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("invited response"); *Mercer v. United States*, 724 A.2d 1176, 1184–85 (D.C.1999) (evidence of alleged witness intimidation).

13. The trial court made quite clear its awareness of the normal ban on introduction of lie detector evidence under the *Frye* line of cases.

My interest is in showing the jury that this procedure was coercive and Judge Greene agreed with me that it was coercive; that what happened was they had him over there for an hour. They went through the procedure and then they talked to him and told him he was lying. They sat down and told him that he was lying and then he changed his mind.

Your Honor, I don't have to bring out that they showed it to him three times if that is the concern, but I believe the truth of the matter is whatever they were doing there, that was a coercive procedure and that as a result of what went on there, the testimony was changed. And so my interest is in avoiding what I think is very undue prejudice from the voice stress and bringing out what I think is a fact that Judge Greene agreed with me that there was pressure in the situation and that there was a change thereafter. And I'm agreeable to work with the Court on instructions on that or limitations on my cross examination that would achieve those goals of bringing out not unduly prejudicing either the Government or Mr. Proctor.

The court took no heed of this possible approach. The discussion then focused on distinguishing the evidence at issue from expert testimony offered for determining veracity of a statement, without exploring further the compromises defense counsel suggested he might make or other intermediate approaches. *See Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1996).

Third, as a feature that may have contributed to the shortcomings already described, the trial court ruled that evidence of the CVSA would be admitted at trial based exclusively on pre-trial arguments made during a bench conference. The prosecution asserted that the defense tactics in the first trial had been unfair and had determined the outcome of that proceeding. The defense contested this version of events. Because the judge presiding over the retrial did not preside over the original trial, he lacked first-hand knowledge of how the defense's impeachment of Avery played out in the original trial.[14]

A provisional pretrial ruling might have been made, but one that allowed for the possibility of change depending upon developments at trial, including that, forewarned about the possible admissibility of lie detector rebuttal evidence, the defense would alter its approach. And a delay in a final ruling would have permitted the trial court to more precisely balance the probative and prejudicial factors. The consequence of the definitive pretrial ruling in this case was that the prosecution in its opening statement went into considerable detail about the administration of the CVSA, referring to it as a lie detector test, as it did during the direct testimony both of the questioning detective and Mr. Avery. Thus presented, the CVSA was highlighted as a significant feature of the prosecution case, rather than a response to impeachment by the appellant.[15]

■ Given the foregoing problems with the trial court's exercise of its discretion, we need not (indeed, we are unable to) determine whether the admission of such evidence in some form could have eventually been within the range of properly informed and exercised discretion in this particular case. We are satisfied, however, that what happened was not harmless. We noted in *Peyton, supra,* that "despite its status as a pariah ... not all references to polygraph tests warrant reversal." *Peyton,* 709 A.2d at 70 n. 13 (quoting *Maryland v. Hawkins,* 326 Md. 270, 604 A.2d 489, 492 (1992)). *Peyton* set out factors to be considered in determining whether testimony about a lie detector could be harmless error, relying heavily on the Maryland decision in *Guesfeird v. State,* 300

---

**14.** For that matter, this court also lacks any basis for deciding the gravity of the situation facing the prosecution, as the transcript of the first trial was not a part of the record on appeal.

**15.** In an analogous legal context, we have stated that "introduction of otherwise inadmissible evidence under shield of [the doctrine of curative admissibility] is permitted ¦only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.'" *Jenkins v. United States,* 374 A.2d 581, 586 (D.C.1977) (quoting *United States v. Winston,* 145 U.S.App.D.C. 67, 71, 447 F.2d 1236, 1240 (1971)). *See also Mercer v. United States, supra,* 724 A.2d at 1189 n. 7, 1192–93.

Md. 653, 480 A.2d 800 (1984). While the *Peyton* error survived most factors, the error that presents itself before us now does not. The factors are as follows:

> (1) whether the reference to a lie detector was repeated or whether it was a single, isolated statement; (2) whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; (3) whether the witness making the reference is the principal witness upon whom the entire prosecution depends; (4) whether credibility is a crucial issue; (5) whether a great deal of other evidence exists; and (6) whether an inference as to the result of the test can be drawn.

*Peyton, supra,* 709 A.2d at 70. In this instance, the CVSA was a featured component of the prosecution's case, in its opening statement, in its examination of Avery and the questioning detective, and in closing. Avery was without doubt a key witness whose credibility was questioned, and a jury could easily infer the results of the test. A prior jury not cognizant of the CVSA evidence was unable to find the appellant guilty. Given all the circumstances, we do not see how the error in this case can be deemed harmless.

*Reversed and remanded.*