Isaac L. BURGESS, Appellant,

v.

UNITED STATES of America, Appellee.

James E. Waddell, Appellant,

v.

United States of America, Appellee.

Nos. 95–CF–1816, 96–CF–247, 98–CO–896.

District of Columbia Court of Appeals.

Argued Nov. 10, 1999.

Decided Dec. 6, 2001.

Kenneth H. Rosenau, Washington, DC, for appellant Isaac L. Burgess.

Joseph Metcalfe, Public Defender Service, with whom James Klein, Samia Fam, and Gretchen Franklin, Public Defender Service, were on the brief in No. 96–CF–247, for appellant James E. Waddell.

Mindy A. Daniels, appointed by this court in No. 98–CO–896, for appellant James E. Waddell.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ, and WASHINGTON, Associate Judges.

RUIZ, Associate Judge.

Isaac Burgess and James Waddell were indicted for first degree premeditated murder while armed, see D.C.Code §§ 22–2401, –3202 (1996 Repl.), assault with intent to kill (AWIK) while armed, see D.C.Code §§ 22–501, –3202 (1996 Repl.), possession of a firearm during a crime of violence (PFCV), see D.C.Code § 22–3204(b) (1996 Repl.), and carrying a pistol without a license (CPWL), see D.C.Code § 22–3204(a) (1996 Repl.). Albert Quiovers was also named a defendant; he entered a plea to a lesser-included conspiracy charge and testified for the government at appellants' trial. A jury acquitted both appellants of first degree murder and AWIK, but convicted them of the lesser included offenses of second degree murder while armed, assault with a dangerous weapon (ADW), and the weapons offenses. Appellants were sentenced to fifteen years to life for second degree murder while

armed, forty to hundred-twenty months for ADW, five to fifteen years for PFCV, and one year for CPWL, to run consecutively.

On appeal, Burgess claims that the court plainly erred when it permitted evidence of an uncharged crime, *i.e.,* that he and a group of friends had initially agreed to mislead the police about their involvement in the murder, and when it failed to intervene *sua sponte* in the prosecutor's closing argument. He also claims the trial court abused its discretion in admitting a hearsay statement made by Quiovers presented during the testimony of Eric Cloyd, another government witness. Waddell appeals the trial court's denial of his collateral challenge that he was denied the effective assistance of counsel, which is based on Burgess' claims on direct appeal. We see no merit to Burgess's claims (and, thus, to Waddell's collateral challenge).

Waddell's claims on direct appeal are more substantial. He argues that the trial court abused its discretion by excluding a photograph of Eric Cloyd posing with the murder weapon that was central to his defense and that the jury selection process used by the trial court impaired his right to the use of peremptory challenges. Although Waddell's argument that the voir dire and selection process in this case could have infringed on the full exercise of peremptory rights potentially raises a serious concern, the record shows that his right to peremptory challenges was not, in fact, impaired. We agree with Waddell's claim that the trial court erred in excluding the photograph, but conclude that the error was harmless. Therefore, we affirm.

## I. Facts

Isaac Burgess, James Waddell, Albert Quiovers, Aaron Byers, and Eric Cloyd were friends who had known each other for many years. The five of them fre-

quently socialized with one another. On the night of July 8, 1993, at 11:30 p.m., the five young men were together when two of them murdered Fred Pass and shot Donald Reeves twice in the leg. The government's case rested primarily on the testimony of Quiovers, Byers and Cloyd, who testified that several hours after Quiovers got into a heated argument with Pass, Burgess and Waddell shot and killed Pass and wounded Reeves. The defense theory was that the shooters were not Waddell and Burgess, but Cloyd and Byers.

The afternoon before the murder, Quiovers and Aja Pass, Fred Pass' daughter, were talking outside of the Pass home on Morris Road, in Southeast Washington, D.C., when Mr. Pass joined them. Ms. Pass testified that her father and Quiovers began to argue because Mr. Pass did not want her to spend time with Quiovers, but also admitted the two men argued over money that apparently Quiovers owed to her father. Quiovers later testified that he owed Mr. Pass $20.00 because he had sold fake crack cocaine to Mr. Pass. The argument went on for about five minutes, during which each man threatened the other.

Twenty minutes after this argument, appellant Waddell arrived at Quiovers's house with Byers and Cloyd. Quiovers told his friends about his argument with Mr. Pass over the debt and that Mr. Pass had threatened him. According to Cloyd and Byers, Quiovers seemed agitated and scared of Mr. Pass. The group tried to pacify Quiovers and they discussed what he planned to do about the threats, to which he responded that he would talk to Mr. Pass to see if he was serious.

The four friends went to Fort Stanton Park where they met up with appellant Burgess and watched a basketball tournament. The five then left together in a four-door Chevrolet Impala which belonged to Burgess' girlfriend. They drove

to Gainesville Street to buy marijuana, went to a liquor store to buy beer and fortified wine, and then stopped at a fast food restaurant. They proceeded to Hains Point where they smoked marijuana, drank beers, and talked to some girls for a few hours. While there, Quiovers started to talk again about his encounter with Fred Pass, according to Cloyd, "complaining, whining, whatever," and in response, the group "basically didn't say anything," or "[told] him anything, basically, just to shut him up."

Cloyd drove the group back in the Impala to the Morris Road area. Waddell rode in the front passenger seat, Burgess sat behind Waddell in the back on the right, Byers sat in the back on the left behind the driver's seat, and Quiovers sat in the middle of the back seat. As they drove along Morris Road, Quiovers pointed out Mr. Pass. Burgess then asked, "Y'all trying to get him?" No one responded.

Cloyd stopped at the apartment building where he and Waddell lived. They got out of the car to get weapons and returned to the same seats in the car; Cloyd had with him a .22 automatic handgun, and Waddell had a .32 or .38 caliber revolver. Cloyd admitted that he owned the .22 automatic "for protection" and had allowed others to handle his gun. According to Cloyd and Quiovers, Waddell had owned the revolver for a few months prior to the night of the murder.

Once back in the car, Cloyd drove the group to the parking lot of Our Lady of Perpetual Help church. The witnesses's testimony differed on precisely what was said during the conversation, but Byers testified that Quiovers and Burgess were arguing about who was going to shoot Mr. Pass. Cloyd eventually left the parking lot and drove toward an alley adjacent to Morris Road where the Passes lived. Quiovers, Cloyd and Byers testified that Bur-

gess left the car with Cloyd's .22 pistol and Waddell left carrying his own revolver, and that none of the others left the car. Cloyd drove the car down an alley and waited for Burgess and Waddell to return. Several minutes later, the men in the car heard gunfire.

Gary Johnson, a neighbor, testified that he saw the car in the alley from his front porch, saw a man exit the front passenger side of the car and another exit the rear passenger side while the other three remained in the car. Reeves testified that he had noticed two black males turning the corner onto Morris Road, but "really wasn't paying them that much attention." They greeted him with "Hey, dude," and "then one of them said, 'Are you ready?' and they just turned around and started firing." He estimated they fired about a dozen shots. Reeves dove out of the way of the gunfire but was shot twice in his left leg. The Deputy Chief Medical Examiner testified that the autopsy report on Mr. Pass revealed that he had suffered seven bullet wounds which caused his death.

After Cloyd, Byers and Quiovers heard the gunshots, Burgess and Waddell ran to the car and got in as Cloyd rapidly drove away. They went to Gainesville Street where everyone exited the car. The witnesses differed as to what happened next. Quiovers told the jury that Burgess wrapped the guns in a jacket and looked for someone to hold them. Byers testified that Burgess and Waddell both went to hide the guns behind a building while he, Quiovers and Cloyd stood on the corner. Cloyd said that the entire group first gave the guns to someone named "Scoop" in Gaithersburg, Maryland. After Byers became nervous about leaving the guns there, Cloyd, Waddell and Byers retrieved the guns from Scoop, and Byers took the weapons to someone named Jerome Silver

who agreed to hold them. The weapons were never recovered.

Burgess drove his girlfriend's car home, leaving the others, who walked to Cloyd's apartment. Quiovers went home shortly thereafter when he learned the police were at his house.

The next day, Quiovers met Cloyd and Waddell at the Public Service Commission, where Cloyd and Waddell worked. Cloyd testified that Waddell was "sad and down" and said "what we did was wrong" and that he "should have turned [himself] in." Cloyd described what Waddell told him:

> he walked down Morris Road. He got around Fred [Pass] and he said [there] was another dude outside with him. He said he kind of hesitated when they walked past him and Fred looked like what's up, like, addressed it, like hey, and he said he did it back .... took a few more steps like he had hesitated and walked past him. And then turned around and started shooting.

Quiovers told Cloyd and Waddell that he had been questioned by the police about the shooting and had told the police everything about that evening except the events that transpired after the time the five men returned from Hains Point. He led the police to believe that they all went home after leaving Hains Point. The group decided that if any of the others were questioned, they would all tell a story consistent with Quiovers's statement to the police.

The five continued to socialize throughout that summer. During the course of the summer, Cloyd heard Burgess acknowledge that he shot Fred Pass. Byers overheard Burgess "saying they let one get away," to which appellant Waddell replied, "My fault."

Waddell testified in his own defense that after the group left Hains Point, he asked Cloyd to drop him off at his friend Philip Glover's house. After a time, he walked home and did not learn of the shooting until the next day when he spoke with Quiovers and Cloyd at work. Waddell also denied possessing a gun on the night of the murder or owning a gun.

Two eyewitnesses testified describing the appearance of the shooters. Donald Reeves testified that one of his assailants was a black male, 18–20 years old, heavyset, with a dark complexion, close-cropped hair, and thick lips. He testified that the second man had a slim build and had a lighter complexion. Johnson, the neighbor, testified that he saw two men emerge from the car, one skinny and the other darker and heavyset. At trial, defense counsel pointed out that Waddell was heavier, but had a lighter complexion than, Burgess. Byers was heavy and had a dark complexion. Cloyd was thinner than Byers and had the lightest complexion of all five men in the car. Thus, according to the defense, Byers and Cloyd better fit the eyewitnesses's description of the shooters than did Burgess and Waddell.

Quiovers was arrested in June 1994, a year after the murder, and pled guilty to conspiracy to commit first degree murder, limiting his sentence to a maximum of five years with the possibility of probation. As part of his plea, he agreed to testify for the government. Byers and Cloyd were not questioned by the police until the summer of 1994, when they initially denied any knowledge of the murder. Ultimately, they revealed their involvement. Neither was ever charged with any crime, and received Declination of Prosecution letters from the government. Cloyd also received monetary assistance to relocate to Virginia with his mother through the witness protection program.

## II. Burgess's Appeal, No. 95–CF–1816

We first consider and easily dispose of Burgess's claims on appeal.

### A. Admission of "other crimes" evidence

Burgess asserts that the trial court erred in admitting evidence that he and the others conspired to conceal the crime because the government did not give advance notice of its intent to do so. Moreover, he argues that the evidence did not meet the requirements of *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).[1]

■ In its case in chief the government introduced evidence that appellants agreed to conform to the version of events Albert Quiovers told the police on the night of the shooting, denying knowledge of the murder. Defendants objected to the evidence on the ground that Quiovers's statements to the police were hearsay, see discussion *infra*, but did not invoke *Drew*. As Burgess did not make an objection at trial on the ground on which he now seeks to appeal, he must overcome the substantial hurdle of plain error review. *See (Patrick) Lee v. United States*, 699 A.2d 373 (D.C.1997). Therefore, in addition to being plain, the error complained of must be "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Id.* at 388 (quoting *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc)).

■ The evidence in question was not subject to *Drew*'s strictures. The agreement Burgess reached with his friends to coordinate their stories shows consciousness of guilt and is directly admissible evidence of the charged crime separate from its potential status as evidence of other, uncharged crimes. "Threats, bribery, flight, and similar post-crime conduct have repeatedly been held to evince 'consciousness of guilt' and thus constitute 'admissions by conduct' " *(Leon) Proctor v. United States*, 381 A.2d 249, 251 (D.C. 1977) (citations omitted). *Drew* will not work to exclude evidence where the evidence is direct and substantial proof of the charged crime, closely intertwined with the evidence in the case, or necessary to understand what happened. *See (William) Johnson v. United States*, 683 A.2d 1087, 1097 (D.C.1996) (en banc).

Nor was there an obligation to provide advance notice to appellants. Contrary to appellant's assertion of the "crucial need for the government to file a notice of intent to use *Drew* evidence prior to the actual trial," the trial court is not bound by the procedures in *United States v. Foskey*, 204 U.S.App.D.C. 245, 636 F.2d 517, 525–26 (1980), requiring the government's pretrial disclosure of intent to use *Drew* evidence against a defendant. *See Ford v. United States*, 647 A.2d 1181, 1184 (D.C. 1994) ("[T]here exists no specific rule that the government provide advance notice of its intention to introduce *Drew* evidence.") (quoting *Lewis v. United States*, 567 A.2d 1326, 1329 (D.C.1989)). *But see id.* at 1186 (Newman, J., dissenting). Although some trial judges in the Superior Court require advance notice for the same purposes as those on which the federal requirement is based, *i.e.*, eliminating unfair surprise and promoting early resolution of admissibility, such advance notice is not required. *See id.* Burgess does not contend that the government failed to follow the trial court's requirements in this case.

1. In his brief, Burgess also claims in passing that introduction of Waddell's prior possession of a gun was other crimes in violation of *Drew*. Burgess's brief purports to incorporate Waddell's arguments on this point. Waddell does not, however, raise this issue, and we do not reach it.

## B. *Admission of hearsay statements*

■ Burgess contends that the statements by Quiovers to the police about the conspiracy to conceal their involvement in the crime, related at trial through Cloyd's testimony, was inadmissible hearsay. The trial court ruled, over objection, that the testimony was not being admitted for the truth of the matter asserted, and permitted it to be introduced. There were two levels of potential hearsay involved: the statement that Quiovers gave the police, and his statement to Cloyd about what he told the police.

■ The prosecution introduced Quiovers's statements to show that there was a conspiracy to conceal appellants' involvement in the murder from the police. The statement that Quiovers made to the police, that he told them "everything except after the shooting we kill him," was offered to show the genesis of the five men's plan. Contrary to Burgess's argument, it was not the content of what Quiovers told the police, but the fact that he gave *an* account of the group's activities on the night of the shootings to the police that produced the motive for collusion on the part of appellants. The statement that Quiovers made to Cloyd merely completes the loop: Quiovers told his friends what he had told the police, giving them a reason to discuss how they were going to conceal their involvement, by sticking to Quiovers's story. The exact statements are not at issue, only that Quiovers talked to the police and subsequently to Cloyd, giving his friends a reason to collude. If a statement is not offered to prove the truth of the matter asserted, it is not hearsay. *See Perritt v. United States,* 640 A.2d 702, 704 (D.C. 1994). Therefore, these statements were not hearsay, and their admission was not an abuse of discretion on the part of the trial court.[2]

## C. *Improper Prosecutorial Argument*

Finally, Burgess contends that the prosecutor improperly appealed to the jury's sympathies, diluted the requirement of proof beyond a reasonable doubt in exhorting the jury to seek the truth, and interjected his personal opinion as to the veracity of witnesses. He urges that we not review each alleged impropriety separately, but consider their cumulative effect.

■ When reviewing claims of improper prosecutorial argument, this court first determines whether the challenged comments were improper. *See Freeman v. United States,* 689 A.2d 575, 584 (D.C. 1997). If the comments were improper, then the court must "viewing the remarks in context, consider the gravity of the impropriety, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Id.* (quoting *McGrier v. United States,* 597 A.2d 36, 41 (D.C. 1991)). Since appellants did not object at trial to the prosecutor's comments, we will reverse only if the misconduct "so clearly prejudiced" the appellant's substantial rights "as to jeopardize the fairness and integrity of his trial." *Irick v. United States,* 565 A.2d 26, 32 (D.C.1989). Reversal for plain error in cases of prosecutorial misconduct should be confined to "particularly egregious situations." *Id.* The comments about which appellant objects do not demand such extraordinary relief, even when we consider their cumulative impact.

---

**2.** Even assuming the statements were hearsay, they could have been admitted under the exception for admissions of co-conspirators, *see (Brian) Williams v. United States,* 655 A.2d 310, 313 (D.C.1995), whether or not the crime of conspiracy was actually charged, *see Chavarria v. United States,* 505 A.2d 59, 62 (D.C.1986).

First, appellant complains that the prosecutor improperly exhorted the jury to seek the truth, which, he contends, led to a "reduction in the government's burden of proof to some lesser standard closer to that required in a civil trial." However, the prosecutor used the "truth seeking" theme to remind the jury of its role in deciding the facts and determining the credibility of the witnesses. This court has more than once referred to the "truth-seeking" function of the jury and the trial, *see, e.g., (Maurice ) Proctor v. United States,* 728 A.2d 1246, 1249 (D.C.1999); *Carter v. United States,* 684 A.2d 331, 335 (D.C.1996) (en banc). It is doubtful that the prosecution's comment swayed the jury to the detriment of the appellant's defense, as defense counsel also urged the jury a number of times to decide where the truth lay in a case with inconsistent and contradictory testimony. We must, moreover, presume that the jury followed the instructions of the trial court, *see Davis v. United States,* 700 A.2d 229, 232 (D.C.1997); *Powell v. United States,* 684 A.2d 373, 380 (D.C.1996), in this case given after the prosecutor's closing argument, which clearly placed the burden on the government to prove appellants guilty. Therefore, the court did not err, let alone plainly err, in not intervening in the argument *sua sponte.*

Similarly, Burgess's claim that the prosecutor interjected his personal opinion about the veracity of the witnesses is unavailing. A prosecutor is entitled to argue the government's case, and to advocate the credibility of the government's witnesses. "A comment will be within the acceptable range as long as it is in the general nature of argument, and not an outright expression of opinion." *Irick,* 565 A.2d at 36. The prosecutor's argument that "people lie about their innocence" but "[t]hey don't typically lie about their guilt"

was in the nature of argument and was not improper. Even if it were an improper expression of the prosecutor's personal opinion that appellants lied and the government witnesses were credible, again, the court gave clear instructions to the jury, after the prosecutor's closing argument, which we must presume they followed, *see Davis,* 700 A.2d at 232, that the opinions of the lawyers are irrelevant and do not constitute facts in the case.

We agree that the prosecutor walked on dangerous ground when he remarked that the jury should consider, among the five friends, "which ones were willing to admit that they did things wrong . . . and which ones tried to wipe their hands completely." This sort of commentary could suggest to the jury that they should draw an inappropriate inference from the fact that a defendant, in this case Burgess, did not testify. A careful review of the record and the prosecutor's comments reveals that they were not "manifestly intended" to comment on Burgess's election not to testify. *See Brewer v. United States,* 559 A.2d 317, 322 (D.C. 1989), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990) (stating the test as "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be comment on the failure to testify") (quoting *Byrd v. United States,* 364 A.2d 1215, 1218 (D.C.1976)). Rather, they can plausibly be viewed as comments on the inconsistencies and untrustworthiness of appellants' out-of-court statements and behavior seeking to exculpate themselves. Therefore, no plain error occurred.

Finally, Burgess asserts that the prosecutor improperly appealed to the sympathies of the jury by referring to the ills of society and by making reference to the decedent's family in his opening state-

ment and direct examination. Specifically, he complains that the prosecutor's comment that "life is cheap" and, "[y]ou get into an argument with a 16 year old punk, 7 hours later you're shot ..." impermissibly attempted to place the jurors in the shoes of the victim. *See Hill v. United States*, 367 A.2d 110, 113 (D.C.1976) ("[t]he prosecution should never attempt to put the jury in the place of the victim of the crime"). This argument is frivolous. Clearly the statement "you get into an argument ..." referred to Fred Pass, the man who did get into an argument with 16–year–old Quiovers and was shot, as evidenced by the very next sentence in which his name and that of Donald Reeves, the other victim of this particular crime, are mentioned. The remarks were brief, and in the context of the following multi-day trial, are not plain error. With respect to the references to the victim's family, Burgess argues that mention of Pass's seventy-nine year old blind mother were improperly designed to elicit empathy. The questions served to explain why she had not testified and helped to establish the events leading up to and following Pass's death. The failure of experienced counsel to object to any of these statements suggests that they perceived little if any prejudice to their case at the time, *see (David) Lee v. United States*, 668 A.2d 822, 832 (D.C.1995), and we perceive none here.[3]

### III. Waddell's Appeal, No. 96–CF–247[4]

#### A. Jury Selection Procedure

Waddell asserts that the trial court erred in denying defense counsel's request to complete voir dire of the entire venire

panel before excusing any jurors on peremptory challenges. The trial court used a supplemental panel of twenty-five jurors and provided three additional peremptory strikes to each side after the initial panel of sixty jurors proved to be insufficient to select a jury. Waddell contends that this procedure forced him to make peremptory challenges "without information essential to an informed and intelligent decision about which jurors to strike." He claims a right to know the whole pool of prospective jurors before having to exercise any peremptory challenges.

Prior to jury selection, the trial court explained that she would permit the government and the defense to exercise ten peremptory challenges each (five for each defendant), plus each side would be permitted an additional strike for the alternate jurors. The trial court left to Waddell and Burgess whether they would exercise their challenges jointly or consecutively.

The initial jury panel of sixty was called, and after questions were posed and jurors were dismissed for cause, there were twenty-seven jurors remaining prior to the exercise of peremptory challenges. Counsel for Burgess requested that the panel be supplemented with more jurors to ensure the venire would be sufficient to choose the entire jury. The court initially agreed to start afresh with a new panel of sixty the next day, so long as all of the jurors remaining after the for-cause challenges of the first day were willing to return. However, after further reflection, the court expressed concern for the undue hardship placed on jurors to return the next day,

---

**3.** Burgess's remaining list of errors were sustained on objection, so we need not consider them.

**4.** Waddell's appeal from the denial of his § 23–110 motion, No. 98–CO–896, is affirmed, because he cannot show prejudice, *see*

*Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for the reasons set forth rejecting Burgess's claim of evidentiary error and improper prosecutorial argument.

and agreed to add more jurors prior to the exercise of peremptory challenges. The trial court then altered this plan over defense counsel's objection, and proceeded in the hope that the jury pool would suffice. After the ninth round of challenges, however, the jury pool was depleted before a full jury could be selected. Because Waddell had used his challenges before Burgess, Waddell had used all five of his peremptory challenges. The judge declined counsel's request to "start from scratch totally with a whole new package of 60," and instead allowed each side three more peremptory challenges on the following day. Both defendants objected.

After completing voir dire of the twenty-five supplemental panelists, the parties were free to strike from the jury box, which held only jurors from the original panel of the previous day, or from the supplemental panel consisting of venire members not struck for cause. The government exercised one strike, and defense counsel exercised three, two from the original panel and one from the supplemental panel. Neither the government nor the defense struck alternate jurors, and the jury was seated.

■ Because the right of peremptory challenges is not constitutionally based, *see Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), any violation of the process is analyzed as a "trial error" under *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (drawing a distinction between "trial errors" and constitutional "structural errors" and concluding that only the latter type of errors can never be

deemed harmless), subject to harmless error review. *See Sams v. United States,* 721 A.2d 945, 951 (D.C.1998); *Lyons v. United States,* 683 A.2d 1066, 1070–71 (D.C.1996) (en banc). Appellant must show there was error in the trial court's jury selection procedure and that he suffered prejudice as a result of the error. *See (Patrick) Lee,* 699 A.2d at 381.

In *Lee,* the trial court faced the exact situation presented here with respect to voir dire and peremptory challenges. *See Lee,* 699 A.2d at 380–81. In that case, since the procedure was explained before either side exercised any peremptory challenges and both sides had exercised nearly the same number of strikes (five for the defense and six for the government), the addition of a new venire affected both sides equally and the court found no prejudice that would justify reversal.

■ Here, the trial court was aware that the venire panel might be too small before any peremptory challenges were used, and eventually made a decision to supplement the venire rather than begin anew, in order to complete jury selection. Before the supplemental panel was brought in, both sides had exercised the same number of strikes, nine each.[5] Both sides were in the same position and had been affected by the change in rules in the same fashion, creating no imbalance. Overall, the defense received and was able to use twelve peremptory challenges, two more than Rule 24 requires.[6] *See* Super. Ct.Crim. R. 24 (2000). Also in conformity with the rule, the prosecution exercised its strikes first in each round. As in *Lee,* we need not decide whether there was error

---

**5.** Waddell had exercised five peremptory challenges, and Burgess, four.

**6.** Each appellant personally was allowed six challenges, but Rule 24(b) expressly allocates challenges to "each side," not each defen-

dant, the presumption being that defendants fairly joined for trial will cooperate in joint use of their peremptory challenges. In *Lee,* there also were two defendants who exercised strikes alternately. *See Lee,* 699 A.2d at 381.

in the jury selection procedure because, even if there was, appellants have not demonstrated prejudice. *See also United States v. Thompson*, 76 F.3d 442, 451–452 (2d Cir.1996) (defendant's right to peremptories adequately protected where he "had the opportunity to consider 11 of the 12 jurors before exercising his last peremptory challenge").

Appellant correctly argues that he is entitled to an intelligent and effective exercise of peremptory challenges. *See Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 38 L.Ed. 208 (1894) ("Any system for the empaneling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned"); *Evans v. United States*, 682 A.2d 644, 647 (D.C. 1996) ("[E]ach party has an equal right to the unfettered exercise of its peremptory strikes, whether by ensuring full access to relevant information, or by ensuring an equal number of peremptory challenges.") (citations omitted); *(Lawrence) Williams v. United States*, 552 A.2d 510, 512 (D.C. 1988) (referring to "the effective exercise" of the right to peremptory challenges). There is a danger that the jury selection procedure employed by the trial court in this case might impair this right if counsel does not have an informed basis on which to decide whether and how to use an available strike. Reversal is not required here, however, because appellants were not so prejudiced. Once the entire combined venire panel was known, appellants chose to strike only one juror from the supplemental panel, and two from the original panel.

Appellants had the opportunity to strike others from the supplemental venire panel but chose not to do so.[7] The last strike appellants used was against a juror in the box from the original panel, leading to the conclusion that they had no greater objections to the jurors in the supplemental panel. Since Waddell was not prevented from using his challenges, together with those available to Burgess, based on the panel as a whole, his right to exercise peremptory challenges was not impaired.

## B. Exclusion of photograph

. Ballistics evidence and autopsy results indicated that Fred Pass died as a result of multiple gunshot rounds fired from a .22 semiautomatic pistol and a .32 caliber revolver. Based upon the testimony of Cloyd, Byers, and Quiovers, the government argued that Waddell used his .32 revolver in the shooting while Burgess used a .22 semiautomatic that belonged to Eric Cloyd.

In direct examination, Cloyd testified that he and Waddell obtained two guns, a .22 caliber semiautomatic pistol and either a .32 or .38 revolver from their apartment building. "[T]he purpose was to get the guns, so Albert [Quiovers] could shut up." Cloyd admitted that he owned the .22 semiautomatic for about one month before the murder, and testified that Waddell had owned the revolver "for a few months." He explained that he had seen Waddell's revolver previously and had handled it himself. Cloyd said that he had permitted others to handle his gun as well. On the night of the murder, according to Cloyd,

**7.** At trial Waddell's counsel articulated the potential prejudice as follows:

> [M]y exercise of the five strikes so far has been impaired because I ... made them without knowing anything about these new people who will be remaining in the panel. And I could have had an opportunity to strike people in that panel as opposed to

> striking people who were placed in the box based upon what I knew about those people, and today, if I'm finding out something different about these new people, then certainly I did not have that information yesterday.

Waddell carried his own revolver, and Burgess carried Cloyd's .22 pistol.

On cross-examination, defense counsel attempted to establish that Cloyd owned both a .22 pistol and a revolver. Cloyd had admitted to his ownership of the .22 semiautomatic pistol, and to seeing it "a lot," as well as touching and handling the gun at times during the summer. He denied owning a revolver during the summer of 1993, and said that he "never had claims to [Waddell's] gun" but acknowledged that he had access to it. Cloyd also admitted that he had posed for a photograph with a revolver in his hand "a while before" July 8, 1993. During cross-examination of Detective King, the government's firearms expert, Waddell's counsel attempted to have the expert identify the gun Cloyd was holding in a photograph as a .32 caliber revolver, the same type of weapon government witnesses claimed Waddell used in the assault on Pass and Reeves. The trial court refused to permit the use of the photograph.

After the trial court denied appellants' motions for judgment of acquittal, Waddell indicated that he wished to introduce the photograph in his own case for the purposes of 1) corroborating the defense theory that Waddell did not possess a .32 caliber revolver on the day in question, 2) showing that others had such a weapon and shot Mr. Pass, 3) refuting Cloyd's claim that he merely possessed, but did not own the gun, and 4) supporting that Cloyd had access to the gun. Waddell asserted that the photograph would not be prejudicial to the government since Cloyd had already admitted having access to the gun. The trial court again denied the request to admit the photograph of Cloyd holding the .32 gun.

Waddell argues on appeal that the trial court's refusal to allow him to introduce the photograph of Cloyd posing with the gun was an abuse of discretion. He contends that the trial court committed reversible error when it found that the photograph lacked probative value, relied on an incorrect understanding of the law of evidence, and violated his Sixth Amendment right to present evidence to corroborate his defense.

■■■■ The accused in a criminal prosecution has a fundamental right to call witnesses in his own defense. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Evidence that someone other than the accused has committed the crime for which the accused is charged may be presented when there are sufficient indicia that the evidence is reliable. *See Chambers*, 410 U.S. at 298–303, 93 S.Ct. 1038. "When guilt of another person is inconsistent with guilt of the defendant, it is always relevant for the defendant to present evidence that such other person committed the crime." 1 WHARTON'S CRIMINAL EVIDENCE § 195 at 404 (13th ed.1972) *(quoted in Brown v. United States*, 409 A.2d 1093, 1097 (D.C.1979)). Relevant evidence should ordinarily go to the jury. *See Dockery v. United States*, 746 A.2d 303, 306–307 (D.C.2000) (quoting *Home Ins. Co. v. Weide*, 78 U.S. (11 Wall.) 438, 440, 20 L.Ed. 197 (1870)).

■■■ This court has adopted the standard in Federal Rule of Evidence 403, which dictates that relevant evidence may be excluded if its probative value is substantially outweighed by its prejudicial effect. *See (William) Johnson*, 683 A.2d at 1099–1101. The trial court's decisions about admission or exclusion of evidence are reviewed for abuse of discretion. *See Mercer v. United States*, 724 A.2d 1176, 1182 (D.C.1999); *(William) Johnson*, 683 A.2d at 1095 ("[T]he evaluation and weighing of evidence for relevance and potential

prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision.").

The trial court excluded the photo of Cloyd holding the gun after finding that it "is not of any probative value in that the fact that the witness possessed a firearm on another date, not the date of the murder, the date of the killing, does not shed any light on the issue of who used the firearm on the day in question." Waddell argues that the trial court's reasoning is inconsistent with our case law.

"This court has 'held on several occasions that evidence of possession of a weapon on an earlier occasion by one later charged with using a similar weapon is probative, relevant evidence.'" *See (Phillip) Johnson v. United States,* 701 A.2d 1085, 1092 (D.C.1997) (citations omitted). In *Johnson* a photograph of defendant holding a gun was admissible because the requisite link was made between the gun the defendant held in the photograph and the gun used in the crime, even though there was a long lapse between the date of the photograph and the crime. *See id.* (citing *King v. United States,* 618 A.2d 727, 728 (D.C.1993)). It follows that possession of a gun by a witness who the defendant claims committed the shooting offense must also be "some evidence of the probability of his guilt"—lowering the probability of the defendant's guilt. *Coleman v. United States,* 379 A.2d 710, 712 (D.C.1977).

Here, there was no specific evidence as to the date Cloyd's photograph with the gun was taken. Nor is there evidence as to whether the gun in the photograph was the gun used in the crime. Nevertheless, the evidence established a strong link between the gun Cloyd held in the photograph and the murder, and between Cloyd and the commission of the crime. There is no question that Cloyd was part of the group present before, during, and after the shooting. In addition, Cloyd testified that the same type of gun was owned by Waddell, that he (Cloyd) had seen it many times, had access to it, and had handled it several times in the months preceding the crime. According to Cloyd, he and Waddell brought their respective weapons to the car on the night of the murder, and disposed of them afterwards. Therefore, the judge's ruling that the photograph had no probative value was incorrect. The photograph was highly probative of the fact that Cloyd had possessed a gun similar to the one used in the murder.

The trial judge has discretion to exclude relevant and otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *(William) Johnson,* 683 A.2d at 1090. "Unfair prejudice" within the context of Rule 403 means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Mercer,* 724 A.2d at 1184 (quoting Fed.R.Evid. 403 Advisory Committee's Note); *see also Old Chief v. United States,* 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Doe,* 284 U.S.App.D.C. 199, 204, 903 F.2d 16, 21 (1990). These standards apply whether evidence is sought to be introduced by the prosecutor or the defense, including where the defense seeks to introduce evidence that another person committed the crime. *See Winfield v. United States,* 676 A.2d 1, 4–6 (D.C.1996) (en banc).

In excluding the photo, the trial court ruled that since Cloyd had already testified that he had handled the gun and been photographed with it some time before the murder, the photograph itself did not add anything to the probative value of the testimony. In its initial ruling, at the time

the defense first attempted to use the photograph during the cross-examination of Detective King, the trial court ruled:

> [Cloyd] said there was a picture of him taken where he was posing with a revolver. So there is already testimony to that effect and I don't believe—there is no other probative value other than to inflame the jury. The witness is standing with a white cap pulled down over his eyebrows and is standing in what I would describe as a thug-like position, with a gun.

When counsel later moved to introduce the photograph into evidence as part of the defense case, the trial court denied the motion, reasoning:

> [T]he witness did acknowledge that he did possess Mr. Waddell's revolver, or the revolver, and that a photograph of him was taken. So there already is testimony of that before the jury.
>
> The photograph would corroborate what he already has testified to. So it is not of any probative value in that the fact that the witness possessed a firearm on another date, not the date of the murder, the date of the killing, does not shed any light on the issue of who used the firearm on the day in question. The photograph was taken at some time unrelated to this. So I don't think it has any probative value.
>
> The photograph shows the witness in a menacing or what I described as a thug-like pose. I think it is highly prejudicial. If it was a photograph of the Defendant carrying a weapon like this, I think I'd have to be peeling counsel off the ceiling if the Government tried to admit a photograph where the person carrying the photograph [sic] was holding it in such a menacing way. So I

think it is inflammatory and not of probative value.

▆▆▆▆▆▆ Certainly the photograph could make the jury look with disfavor upon the government's witness, Eric Cloyd. But the defense is entitled to discredit the government's witnesses, and to do so with strong evidence. *See Lawrence v. United States*, 482 A.2d 374, 376 (D.C.1984) ("Central to the fundamental right of confrontation and to the conduct of an effective defense is the opportunity to cross-examine government witnesses against the defendant.") That right is violated where a defendant "was prohibited from engaging in otherwise appropriate cross-examination," and was unable to "present evidence ... in his own defense." *Bassil v. United States*, 517 A.2d 714, 716 (D.C.1986).

▆▆▆▆▆▆ The prejudice which could be created by the photograph is not what Rule 403 was intended to avoid. The trial court's ruling focused on the "inflammatory" nature of the photograph and expressly referenced that the "menacing" and "thug-like" pose would prejudice Cloyd, a government witness testifying under an immunity agreement. Although it may not be appropriate to attack the opposing party's witnesses on extraneous facts, in this case the photograph and the gun used in the murder were very closely linked, and the photograph was highly probative that, as the defense contended, Eric Cloyd was one of the shooters. Once a witness has been linked to a crime, the defense may attempt to show that the witness—rather than the defendant—was the perpetrator of the crime and a defendant's attempt to do so should not be thwarted by inclusion in the category of "improper" and "emotional" prejudices shielded by Rule 403.[8] In the context of this case, where

---

8. "Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case." *Mercer v.*

Cloyd was a participant in the crime who obtained immunity in exchange for his testimony, the fact that the photograph would show Cloyd comfortably—and menacingly—handling the .32 revolver does not unfairly tug at the emotions of the jury, but rather leads them to the exact conclusion that the defendant is entitled to draw: that Cloyd was likely to have been one of the shooters. While no doubt the evidence would have been severely prejudicial to the jury's assessment of the character of the witness, it was already severely impugned by Cloyd's admitted involvement in a violent felony. Any prejudice to Cloyd, and to the government's case, from introduction of the photograph is due to its corroboration of the defense theory that Cloyd was one of the shooters. The cloak of "undue prejudice" does not protect witnesses acknowledged to be present and participating in the crime from reasonable inferences that they may have committed the crime.

■■■■ "The trial court must resolve close questions of admissibility . . . in favor of inclusion, not exclusion . . . [A] substantial proffer that a third person committed the offense implicates the defendant's constitutional right to 'a meaningful opportunity to present a complete defense.' " *Winfield,* 676 A.2d at 6–7 (quoting *Crane*

v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). Applying this standard, we have no doubt in concluding that the photograph should have been admitted.

■■■■ We turn to the impact of its erroneous exclusion on the trial and the verdict. Not every evidentiary decision of the trial court necessarily implicates the constitutional right to present a defense. *See Clark v. United States,* 639 A.2d 76, 82 (D.C.1993). Where ample cross-examination has been allowed, or evidence admitted on a particular issue, the defendant's constitutional rights are not implicated even if the trial court curtails his presentation. *See id.* On the record before us, we are satisfied that any prejudice flowing from the court's refusal to allow the photograph was harmless. Applying the standard enunciated in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946),[9] we are able to say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* at 765, 66 S.Ct. 1239. Considering all the evidence of record, we disagree with appellant's contention that the jury's consideration of the photograph would have affected the outcome of the

United States, 724 A.2d 1176, 1184 (D.C.1999) (quoting 2 JACK B. WEINSTEIN AND MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 403.04[1][b] (2d ed.1998)). Nonetheless, it is a rare case when potentially inflammatory photographs, usually victims or crime scenes, are excluded as so prejudicial that they may not be fairly weighed by the jury. See, e.g., (Alfred ) Johnson v. United States, 613 A.2d 888, 895 (D.C.1992) (upholding admission of photographs showing victim who had been burned with a hot iron before being raped); Faunteroy v. United States, 413 A.2d 1294, 1299 (D.C.1980) (upholding admission of photographs showing the emaciated body of a two-month-old child who had been killed through the neglect of his parents); Pittman

v. United States, 375 A.2d 16, 19 (D.C.1977) (upholding admission of photographs of a murder victim lying dead on the floor).

9. The test for evaluating reversible prejudice from constitutional violations, i.e., whether the error was harmless beyond a reasonable doubt, see Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), is applied only where a defense or discrete line of questioning is precluded. See Clark, 639 A.2d at 81. No such claim can be made here, where it was well established that Cloyd was capable of the crime—even if not as graphically as the defense would have preferred.

trial. We therefore conclude that the error was harmless and that no abuse of discretion requiring reversal has been shown. *See (James) Johnson v. United States*, 398 A.2d 354, 367 (D.C.1979).

That Cloyd had possessed, handled and posed for a photograph with a .32 caliber revolver and owned a .22 caliber gun was before the jury. Although Cloyd was presented as a promising University of Virginia student, it was clear to the jury that he had not always obeyed the law. Cloyd admitted to owning the .22 caliber semiautomatic pistol that was used by one of the shooters in the murder, said that he kept it in his apartment, and acknowledged that he knew its possession was a crime in the District of Columbia. He testified that there had been a photograph taken of him holding a .32 caliber revolver, that he was familiar with the weapon, had seen it many times, had held it in his hands, and had regular access to it.[10] He admitted to smoking marijuana with his friends and to lying to the police about his knowledge of the crime. Without the photograph, the jury still had ample evidence on which to rest the conclusions urged by Waddell, namely that Cloyd owned the gun, or controlled the gun and had access to it when he wanted, even if it did not belong to him, and therefore was more likely than appellant to have used the .32 caliber in the shooting.

Waddell argues that more was at stake in the photograph than mere possession of the gun, that Cloyd's evident ease handling the gun was necessary to rebut Cloyd's argument that he had acquired his own gun only "for protection." We accept the point, and as already noted, conclude that the jury should have been able to see the photograph and draw its own conclusions.

We think, however, that there was sufficient evidence to enable the jury to conclude that Cloyd was neither uncomfortable with guns or had them only for his own protection. Cloyd testified that he, along with Waddell, went to get the guns in connection with the plan to deal with Fred Pass's threats to Quiovers, and helped dispose of them after the shooting. Cloyd also testified that Burgess used Cloyd's gun in the shooting—permitting an inference that Cloyd gave his gun to Burgess to commit the shooting. Although the jury did not have the photograph of Cloyd's "menacing" and "thug-like" pose, they had information of a real situation in which Cloyd, at a minimum, had facilitated a murder. Between Cloyd's active participation and the undisputed fact that his gun was used in the shooting, the jury had more than enough evidence from which it could have concluded that Cloyd—not Waddell—had the motive, disposition and means to be one of the shooters.

Moreover, the record provides corroborative evidence to refute that Cloyd and Byers were the shooters. In addition to Cloyd's testimony, Byers and Quiovers identified appellants as the shooters and testified to incriminating statements made by them. Gary Johnson, who was not associated with the crime, testified that the men who committed the crime both exited the car from the passenger side doors, and appellants were sitting on the passenger side of the car. Reeves and Johnson both described the shooters as one heavyset, darker-complected man and a slim lighter-complected one, and the defense argued that the description better fit Cloyd and Byers than Burgess and Waddell. The jury was able to observe the four men, however, and draw its own conclusions

---

10. In this regard the photograph was cumulative of other evidence. This does not make the photograph inadmissible, *see Thacker v. United States*, 599 A.2d 52, 58 (D.C.1991), but it is a factor properly considered in evaluating harmlessness.

about which pair best fit the eyewitnesses's descriptions. Accordingly, any error in exclusion of the photograph was harmless.

\* \* \*

For the foregoing reasons, the judgments on appeal are

*Affirmed.*