David A. ROWLAND, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–1095, 98–CO–730.

District of Columbia Court of Appeals.

Argued Oct. 4, 2001.

Decided Jan. 15, 2004.

Kenneth H. Rosenau, Washington, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, and Debra L. Long–Doyle, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, FARRELL, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant David A. Rowland was indicted and tried twice on one count of second degree murder while armed. The first trial resulted in a hung jury. In the second trial, the jury acquitted Rowland of murder but convicted him of the lesser-included offense of voluntary manslaughter while armed. The court imposed a sentence of ten to thirty years' imprisonment

and subsequently denied Rowland's motion for a new trial based on newly discovered evidence that suggested a possible "accidental death" defense.

The primary issue before us in this consolidated appeal is whether the trial court committed reversible error by allowing the prosecution to introduce evidence that a defense witness refused to take a police-administered lie detector test. The United States concedes that this evidence should not have been admitted but argues that the error was harmless. We are persuaded that the error did not contribute to the verdict against Rowland and does not entitle him to relief. In addition, we reject Rowland's other claims of error in his trial, and we affirm the denial of his new trial motion.

## I. Overview of the Case

David Rowland was charged with murdering Metropolitan Police Officer Christie Hoyle on December 7, 1990. The case was an unusual one. Hoyle died while she was alone with Rowland in his apartment. It was Rowland, a police officer himself, who summoned the police to the scene. The cause of Hoyle's death was a single bullet fired into her chest from close range—two to six inches—out of Hoyle's own service weapon, a 9 mm Glock 17 semi-automatic pistol. That weapon, with the expended shell casing still in its firing chamber, was found on the floor near Hoyle's body when the police arrived. Rowland told the police that Hoyle shot herself without warning when he was not looking and while he was out of the room. Later that night, Rowland voluntarily gave a lengthy written statement about the events leading up to Hoyle's death to Sergeant Daniel Wagner in the offices of the Homicide Branch. After Rowland gave his statement, he was allowed to leave without being charged.[1]

At trial, the government presented evidence that Hoyle's death was not the suicide that Rowland claimed. The theory of the prosecution was that Rowland was lying to cover up the fact that he shot Hoyle during a violent altercation. Among the witnesses whose testimony supported that theory was a police officer named Daniel Scott. Officer Scott testified that Rowland told him a few months after Hoyle's death that he and Hoyle had been "arguing over some bitch" of whom Hoyle was jealous; that Hoyle became angry and left the room to get her gun, saying she would kill them both; and that "they struggled over the gun and the gun went off and that was it." Even more damaging was the testimony of Terrence and Michael Harper, two young men who lived in the apartment directly beneath Rowland. They testified that they were at home and heard an exceedingly loud and violent fight between a man and a woman in the apartment above them on the night Hoyle died. Terrence Harper went out before the fight ended, but soon after he left, Michael Harper heard a "loud thump" and a female voice yelling "get off of me." This was followed only seconds later by a loud noise that "sounded like a gunshot." Then the fighting stopped.

The prosecution also relied on forensic evidence to prove that Rowland fought with Hoyle and then shot her. The Deputy Medical Examiner who performed the autopsy on Hoyle testified that in addition to the bullet wound in her chest, Hoyle had fresh bruises and abrasions on her forehead, cheek, neck, shoulders, right breast, right forearm, left wrist, and left hand. Of special interest was a suspicious inch-long abrasion on Hoyle's left palm at the base of her thumb. In the opinions of the Deputy Medical Examiner and police

---

1. Rowland was not arrested until the grand jury returned its indictment in March of 1992.

firearms experts, Hoyle could have incurred this particular injury by grabbing the "slide" of her sharp-edged Glock in a desperate effort to deflect the weapon and stop it from firing at her—something her police training had taught her to do in self-defense. The empty shell casing found in the chamber of the Glock provided additional evidentiary support for this inference, since grabbing the slide when the weapon was fired could have prevented it from ejecting the expended casing and chambering a new round. In addition, Larry Melton, a former Police Department firearm training expert, testified that Hoyle's Glock 17 was a highly reliable weapon with a five-pound trigger pull and three internal safety mechanisms that ensured it would not fire accidentally.[2]

The post-mortem forensic evidence did not provide a definitive answer to the question of who pulled the trigger of the Glock, however. No identifiable fingerprints were found on the Glock or its ammunition, and nitric acid swabs taken on the night Hoyle died did not reveal the presence of gunshot residue on the hands of either Hoyle or Rowland.

Rowland's defense at trial mirrored, for the most part, the detailed statement he gave the police on the night Hoyle died. Rowland testified that he and Hoyle were alone together in his apartment on December 7. Their relationship was an intimate one, but on that day they were feuding.

At some point in the early part of the evening, according to Rowland, Hoyle became so angry that she started swinging at him. This led to some semi-playful tussling, in the course of which, Rowland claimed, he placed "passion marks"[3] on Hoyle's neck, cheek and forehead. Rowland attributed Hoyle's bruises and abrasions to this physical activity,[4] which also arguably explained the sounds of fighting heard by the Harpers in the apartment below. After a bit, Rowland said, the tussling came to an end, but the argument resumed, with Hoyle complaining that Rowland was not spending more time with her. Hoyle left the apartment to go out for the evening without Rowland, but she returned a few minutes later. Once again, Rowland said, Hoyle brought up his failure to spend more time with her. Rowland told Hoyle he was tired of hearing it, walked out of the room, and invited Hoyle to lock the door on her way out. Seconds later, Rowland testified, he heard a gunshot, ran back to the bedroom where Hoyle had been, and saw her falling to the floor.[5]

In view of Rowland's testimony that Hoyle's fatal wound was self-inflicted, a principal focus of the trial was on Hoyle's mental state around the time of her death and whether she was suicidal. The defense undertook to show that Hoyle was under considerable stress from multiple sources—her rocky relationship with Rowland, her work as an undercover police

---

**2.** According to Mr. Melton, the Glock 17 would not discharge accidentally in the event that it was dropped, thrown or subjected to physical abuse, and a small lever located in front of the trigger prevented the trigger from being pulled back inadvertently:

> [I]f I did not put my fingers on the lever itself but I put my fingers on each side of the trigger and tried to pull it back, it will not fire. This is called a trigger safety. It will not come back at all until such time that the finger is placed on the trigger and

> ... deactivates the trigger safety and allows the trigger to fire.

**3.** *I.e.,* temporary red marks produced in love-making by biting or sucking the skin.

**4.** The Deputy Medical Examiner did not agree that the bruises she observed on Hoyle could be explained as mere "passion marks."

**5.** Rowland denied ever giving a different account of Hoyle's death to Officer Scott.

officer, and her concerns about her family-, that she was in a despondent mood, and that she was at serious risk of committing suicide. The prosecution countered that the defense was exaggerating the stresses on Hoyle, that she was functioning well and was not depressed, and that she was not at a heightened risk of suicide. Several witnesses, lay and expert, testified for one side or the other about these matters.

Only two witnesses testified that Hoyle had ever attempted suicide or made what could be construed as suicidal gestures. One of these witnesses was Rowland himself. He described two incidents of which he claimed to have personal knowledge. The first was an episode in the summer of 1990 in which Hoyle, upset over various matters, briefly held her service weapon to her head and told him not to come near. The second was an occasion on which Rowland was awakened in the middle of the night by "the racking of a gun" and saw Hoyle standing with her weapon in her hand, pointing it at the wall. Hoyle allegedly told Rowland that she was unloading the weapon and then made him promise not to marry or impregnate anyone while she was away on active military duty. There was no independent corroboration of either of these incidents, however. Moreover, Rowland mentioned neither incident when he gave his statement to the police on the night of Hoyle's death. Instead, Rowland denied to Sergeant Wagner that he had "ever seen [Hoyle] threaten to kill herself, or talk about taking her life, or play with her service weapon that way."

The other witness who testified about a suicidal gesture on Hoyle's part was Metropolitan Police Officer Dwayne Washington. A close friend of Rowland and, he said, of Hoyle, Officer Washington described an incident that occurred on a night shortly after Thanksgiving, just a few days before Hoyle's death. According

to Washington, Hoyle telephoned him at home and said she was "just calling to say good-bye." Washington drove to Hoyle's apartment. She let him in and then sat down on the floor against the living room wall with her legs crossed, holding her service weapon on her thigh with her trigger finger next to the slide area of the weapon. Washington said he immediately went over to Hoyle and took the weapon out of her hand. The weapon was loaded and there was a live round in the chamber. Washington removed the magazine and the chamber round, placed the weapon and the magazine in separate cabinets in the kitchen, and then returned to the living room. He gave Hoyle a hug, she began to cry, and after she stopped crying, Washington testified, they "started talking about her life, how things were going and her relationship with Mr. Rowland." Hoyle told Washington "how much she wanted to be with [Rowland] and it only to be with her and not no one else that he was seeing."

Officer Washington testified that after they talked for awhile, he and Hoyle left her apartment and drove to the Fifth District Police Headquarters, where Hoyle was detailed as a member of the Vice Unit. Washington carried Hoyle's service weapon and its magazine on the way because he "didn't feel it would be right to give the weapon back to her at the present time." He intended to turn the weapon in to the watch commander. Upon arriving at the Fifth District, however, Washington gave the weapon and the magazine back to Hoyle, and she then went by herself into the Vice Unit office. It was now late at night and the office was unoccupied. Washington followed Hoyle into the office "shortly thereafter" and saw her placing her weapon in the Vice Unit safe, which she had evidently opened. The two then returned to Washington's car and drove to Georgetown, where they got out and took a long walk. Eventually, Washington tes-

tified, he drove Hoyle back to her apartment and left her there. Washington telephoned Hoyle the next day to check up on her. She assured him that she was "feeling fine."

This was the testimony that the prosecution was permitted to impeach by presenting evidence that the witness, Washington, declined to take a polygraph examination.

## II. The Evidence That Officer Washington Refused to Take a Lie Detector Test

Rowland's main contention on appeal is that the trial court erred by admitting evidence that Officer Washington volunteered to take a police-administered polygraph examination but later, through counsel, declined to appear for the examination. The government concedes Rowland's point but argues that the error was harmless. On the latter point, we agree with the government.

### A.

The "lie detector" questioning at trial came about in the following manner. Washington admitted that he did not tell the police about Hoyle's recent suicidal behavior when they interviewed him at police headquarters on the night of Hoyle's death.[6] But, he testified on re-direct, he did report the post-Thanksgiving incident in Hoyle's apartment to detectives at the Homicide Branch in a second interview a few days later. On re-cross-examination, Washington acknowledged that the homicide detectives told him they thought he was lying. Over defense objection, the court then permitted the prosecutor to ask Washington if he offered to submit to a lie detector test to convince the detectives that he was telling the truth. Washington denied making any such offer and agreed that he never took a polygraph examination.

In its rebuttal case, the prosecution recalled Sergeant Wagner to the witness stand. Sergeant Wagner was one of the officers who conducted the second interview of Washington. Sergeant Wagner testified that during the second interview, Washington acknowledged that he had not mentioned the recent incident in Hoyle's apartment to police investigators on the night of Hoyle's death. Washington told Sergeant Wagner, however, that he had described the incident to Rowland's father that night while they both were waiting outside the Homicide Branch for Rowland to be released.[7] Upon hearing Washington say this, Sergeant Wagner interrupted the interview and went to ask Rowland's father, Metropolitan Police Officer John Rowland, if Washington's account was true. According to John Rowland, it was not. John Rowland flatly denied that Washington had told him about the alleged incident.[8] Sergeant Wagner testified that he returned to Washington and confronted him with this contradiction. According to Sergeant Wagner, Washington "became very belligerent" and "complained that everybody was calling him a liar." Sergeant

---

6. Expecting to go with Rowland and Hoyle to a party that night, Washington had arrived at Rowland's apartment building not long after Hoyle was shot. Police were on the scene and Rowland was still there. Washington accompanied Rowland to police headquarters.

7. Washington said the same thing in his testimony at trial.

8. At trial, John Rowland testified that Washington spoke with him for about half an hour on the night of Hoyle's death and, while Washington "may have" told him about the incident in Hoyle's apartment, he did not recall Washington doing so.

Wagner responded that he did indeed believe that Washington was lying.

Sergeant Wagner testified that Washington then volunteered to take a lie detector test. Sergeant Wagner accepted the offer and scheduled a test for the following afternoon. The next morning, though, Washington's attorney called and left the message that Washington would not be coming in that afternoon to take the test. On cross-examination, Sergeant Wagner testified that he assumed that Washington skipped the polygraph examination on the advice of his attorney. Sergeant Wagner acknowledged that he did not know why the attorney gave that presumed advice. Sergeant Wagner did not know if Washington's attorney simply did not trust polygraphs, "didn't want [Washington] to get caught telling a lie," or had some other reason.

In her initial closing argument, the prosecutor made no mention of Washington's offer and refusal to take a polygraph, though she offered the jury other reasons to disbelieve Washington's story about Hoyle's suicidal behavior. For her part, Rowland's trial counsel told the jury that the polygraph-related evidence "has no place in this courtroom."[9] In her rebuttal, the prosecutor ignored this comment. She resumed her attack on Washington's credi-

bility but again said nothing about his failure to take a lie detector test.

After arguments, the trial court, concerned that the jury would wonder "why this case isn't getting resolved through lie detector tests," gave a cautionary instruction explaining that lie detector test results "are not usable in court." "We need," the court stated, "live jurors to listen to live witnesses and decide who is telling the truth." Although the court alluded to "the fact that a witness allegedly offered to take a lie detector test," the court did not instruct the jury on whether or how it might consider that fact.[10]

## B.

■ "Our own case law," like that of most other jurisdictions, "has consistently reflected an aversion to lie detector evidence." *Proctor v. United States*, 728 A.2d 1246, 1249, *amended on reh'g in immaterial part*, 747 A.2d 134 (D.C.1999). This aversion stems, mainly, from the perception that lie detector test results are untrustworthy and tend to carry undue weight with juries. *See id.* at 1249 & 1249 n. 7; *see also United States v. Scheffer*, 523 U.S. 303, 309–315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). For those reasons we have appreciated that "even an indirect reference to the administration of a polygraph examination has a substantial poten-

---

9. "[Her] Honor's going to tell you some things about polygraphs," Rowland's counsel said. "That evidence has no place in this courtroom. It has no place in this courtroom and if Dwayne Washington's lawyer advised him not to take it, that's fine. It has no place in this courtroom."

10. The entire instruction was as follows:
 You might remember that in this case, there was mention of the fact that a witness allegedly offered to take a lie detector test, which is more properly called a polygraph. Do not speculate about why other witnesses in this case were not asked to take a lie detector test. I don't want you to go back

in the jury room and say wait a minute, why have we been here for three weeks, they could have just given lie detector tests to everybody. Well, there's a reason why that didn't get done and there's a reason why you didn't hear about any lie detector test results. In the District of Columbia, the results of lie detector tests are not usable in court. It couldn't be admitted in court even if they did take them. That's why this case isn't getting resolved through lie detector tests and computers. We need live jurors to listen to live witnesses and decide who is telling the truth.

tial for prejudice." *Peyton v. United States*, 709 A.2d 65, 65 (D.C.1998). Thus it is settled in the District of Columbia that the results of a polygraph examination are not admissible to prove that a statement is true or false or that a witness is veracious or deceitful. While the court may have discretion to admit such evidence for other purposes, we have urged caution and insisted on "a conservative approach to the use of lie detector evidence in any context." *Proctor*, 728 A.2d at 1249. "[A]cute awareness of the potential prejudicial nature of lie detector evidence, even when admitted for reasons other than proving a statement true or false, is a hallmark of a decision concerning its possible use." *Proctor*, 728 A.2d at 1250.

The present case, however, does not involve the admission of polygraph test results. There were no test results to admit because Officer Washington declined to submit to the test. We have not considered before now whether a witness's offer or refusal to take a polygraph may be admissible on the issue of the witness's state of mind.[11]

Admissibility depends, in the first instance, on relevance. The rationale for admission in this case was that the jury reasonably could infer that Officer Wash-

ington backed out of submitting to a polygraph examination because he feared the examination would detect that he was lying. As the government points out, the surrounding circumstances could be taken to support such an inference, for Washington did have strong reasons to submit to a polygraph if he believed he was telling the truth.[12] On the other hand, it is quite plausible that Washington declined to be tested for quite the opposite reason— namely, that he feared the real possibility, given the dubious reliability of polygraphs, that his truthful statements could be branded false, with adverse consequences for his own career that are not hard to imagine. It is consistent with this explanation that Washington at first volunteered to take a lie detector test—which arguably indicated that he genuinely believed he was telling the truth—and declined to do so only after he consulted with an attorney.

In view of these considerations, the government candidly acknowledges on appeal that Washington's offer and refusal to take a lie detector test was "insolubly ambiguous." As a general proposition, ambiguity of this sort—the possibility of innocent as well as incriminating explanations for a witness's behavior—is not necessarily a

---

11. Most other courts that have addressed the question have held that evidence of willingness or refusal to take a lie detector test is not admissible on the issue of a witness's veracity. *See, e.g., Kosmas v. State*, 316 Md. 587, 560 A.2d 1137, 1140 (1989) ("In a long line of cases ... it is universally held that evidence of the defendant's willingness or unwillingness to submit to a lie detector examination is inadmissible."); *State v. Hilton*, 431 A.2d 1296, 1301 (Me.1981) ("Evidence of the results of a polygraph test or of a witness' willingness or refusal to take such a test is inadmissible to show a witness' credibility, regardless of the witness' reasons for submitting to or declining the test."). *But see State v. Santana–Lopez*, 237 Wis.2d 332, 613 N.W.2d 918, 921 (2000) ("[B]oth an offer to

take a polygraph test and an offer to undergo a DNA analysis are relevant to the state of mind of the person making the offer—so long as the person making the offer believes that the test or analysis is possible, accurate, and admissible.")

12. "For example," the government states in its brief, "Officer Washington, as a member of the police force, might reasonably be thought to understand that his offer to take a Department-administered test, the results of any test he took, and his ultimate refusal to take a test each would affect the investigation of Officer Hoyle's death, in which his best friend was the principal suspect, as well as, potentially, his own position in the Department."

barrier to admissibility; consider, for instance, the routine admission of evidence of flight. There are exceptions to that general proposition, however, and polygraph evidence, because of its "peculiarly prejudicial nature," *Proctor,* 728 A.2d at 1249, may be one of them. The government has elected not to argue the point but instead to concede that the insoluble ambiguity in this case "made the probative value of the evidence too slight to justify its admission *in light of the firm presumption against all polygraph-related evidence.*" (Emphasis added.) We accept the concession and proceed on the assumption, without deciding the question, that the polygraph-related testimony in this case was admitted in error.

 This is not, of course, the end of our inquiry. "Despite its status as a pariah, ... not all references to polygraph tests warrant reversal." *Peyton,* 709 A.2d at 70 n. 13 (quoting *State v. Hawkins,* 326 Md. 270, 604 A.2d 489, 492 (1992)). The harmless error rule applies. *Accord, Proctor,* 728 A.2d at 1252. Invoking that rule, the government contends that any error in admitting the evidence of Officer Washington's offer and refusal to take a polygraph examination was harmless. The government's showing on this score is persuasive. We find that we can say "with fair assurance, after pondering all that happened without stripping the [purportedly] erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In evaluating the government's showing, we do not minimize either the importance of Officer Washington as a defense witness or the potential implications in the eyes of the jury of Washington's refusal to take a lie detector test. Officer Washington's testimony that Hoyle was suicidal was crucial to Rowland's defense because it provided almost the sole corroboration of Rowland's claim that Hoyle shot herself in his apartment. The prosecution introduced the evidence that Washington reneged on his offer to take a lie detector test specifically to impeach this critical testimony. The government now suggests that because Officer Washington's withdrawal was on advice of counsel, "it had no genuine capacity either to suggest consciousness of dishonesty or to undermine the inference—favorable to appellant—arising from Officer Washington's initial offer to take the test." This suggestion strikes us as unduly sanguine and speculative at best. We must presume that the jury could have viewed Washington's refusal to be tested in the same way the prosecution did at trial—as implying that he knew he was not telling the truth.

Nonetheless, improper though the impeachment may have been, we are satisfied that it made no difference because Washington's account of Hoyle's suicidal gesture was so thoroughly discredited in other ways. The testimony about Washington's offer and refusal to take a lie detector test was icing on a very rich cake. Had the icing been left off, the overall effect would have remained essentially the same.

We think it unnecessary to elaborate on all the reasons the jury was given to disbelieve Washington's account. A few particulars suffice to explain why we reach the conclusion we do.

To begin with, as was ably demonstrated in cross-examination, Washington's account was inherently implausible. If Hoyle, a police officer authorized to carry a weapon, was suicidal and had threatened to shoot herself, why did Washington fail to notify her superiors (or anyone else)? Why did Washington take no steps to get help for Hoyle? Why, instead, did Washington rearm Hoyle by giving her back her

service weapon and its ammunition at a time when she was still a danger to herself? Why, having rearmed the supposedly suicidal Hoyle, did Washington allow her out of his sight for even a moment? Washington had no answers to these questions.

Another serious difficulty with Washington's account was his claim that he watched Hoyle stow her service weapon in the Vice Unit safe. Three of Hoyle's supervisors in the Vice Unit—the lieutenant in charge and two sergeants—contradicted this claim when they testified that Hoyle, a junior officer in the Unit, could not have opened the safe by herself. She did not have the combination. Washington professed to be certain about what he saw Hoyle do, and his testimony on this point cannot be explained away as an honest mistake about an unimportant detail. The impeachment of this aspect of Washington's account was, therefore, telling. To disprove it was tantamount "to pull[ing] out the linchpin of the story." *Patterson v. United States,* 580 A.2d 1319, 1322 (D.C. 1990) (quoting E. CLEARY, MCCOR-MICK ON EVIDENCE § 47, at 111–12 (3d ed.1984)).

Also telling was the fact that Washington did not mention Hoyle's recent flirtation with suicide when the police interviewed him on the night of Hoyle's death. Having accompanied Rowland to the Homicide Branch, Washington knew that his good friend was claiming that Hoyle shot herself in his apartment with her own service weapon. Given what was at stake for Rowland, not to speak of Washington's professional duties as a police officer, it would have been natural for Washington to tell the homicide investigators then and

there that Hoyle had threatened to shoot herself with her service weapon just days before—if, indeed, she had. Washington testified that he withheld this plainly valuable information because he did not want to place Hoyle "in a bad light," a remarkable (not to say bizarre) explanation under the circumstances.[13]

Finally, there was Washington's insistence that he informed Rowland's father about Hoyle's suicidal gesture when the two of them spoke at police headquarters on the night of Hoyle's death. It is hard to reconcile this claim, of course, with Washington's explanation for withholding the same information at the same time from the homicide investigators. But that is a comparatively minor inconsistency. More important, Rowland's father had every incentive in the world to confirm Washington's assertion, if it was true. Instead he contradicted it—not only to Sergeant Wagner but also, and despite a reluctance that is palpable even from the cold pages of the transcript, in his testimony at trial. The government's brief does not exaggerate when it states that "appellant's father's steadfast refusal to support the assertion was devastating impeachment of Officer Washington's whole story."

We come away from the transcript of this trial firmly convinced that if the jury did not believe Washington's story about Hoyle's suicide threat, it was not because the jury learned that Washington refused to take a lie detector test. Whatever the jury ended up believing, it would not have been different had the polygraph-related testimony never been elicited. Assuming error, it was harmless.

---

**13.** Perhaps it could be surmised that Washington kept silent for a different, less honorable but more believable reason, namely, that he feared he would be disciplined if he dis-

closed his failure to report Hoyle's suicidal gesture promptly. This was never the explanation that Washington furnished, however.

## III. Other Direct Appeal Claims

Rowland's direct appeal raises a variety of other claims of error in the conduct of his trial. First, Rowland contends that the trial court should have granted his motion for a mistrial when the prosecution adduced evidence of a previously undisclosed oral statement that he allegedly made to police on the night of Hoyle's death. Second, Rowland contends that the trial court erred in permitting the prosecution to rehabilitate two witnesses with their prior consistent statements. Third, Rowland contends that the trial court also erred in permitting the prosecution to introduce extrinsic evidence to impeach defense witnesses on collateral matters. Fourth, Rowland contends that pervasive prosecutorial misconduct in the examination of witnesses deprived him of a fair trial.

### A. The Admission of Rowland's Oral Statement to the Police

■ Metropolitan Police Lieutenant Tommy Musgrove testified that when Rowland consented to have his hands examined for gunpowder residue on the night of Hoyle's death, he made the comment, "I know a little bit about evidence." [14] That comment was arguably incriminating; by suggesting that Rowland knew enough to remove any gunpowder residue from his hands before the police arrived, the comment neutralized the seemingly exculpatory fact that no residue was detected.

The defense was surprised by Lieutenant Musgrove's testimony, which had not been elicited in Rowland's first trial. Rowland moved for a mistrial on the ground that the government had violated its obligations under Superior Court Criminal Rule 16 by not having disclosed his alleged comment to Lieutenant Musgrove in pretrial discovery. The government responded, *inter alia*, that Rowland's comment was outside the purview of Rule 16 because it was not a response to any police questioning. The trial court rejected that distinction; agreeing with Rowland, the court concluded that it made no difference under Rule 16 that Rowland had "volunteered" his remark. The court declined, though, to grant either a mistrial or Rowland's alternative request to strike Lieutenant Musgrove's testimony in its entirety. Instead, the court decided to strike only the testimony reporting what Rowland had said—relief that Rowland contends was inadequate.

■ The government has the better of the argument. Rule 16 does not require the government to disclose a defendant's oral statement—in contrast to a defendant's written or recorded statement—unless that statement was made "in response to interrogation" by a known government

---

14. The examination by the prosecutor that elicited this testimony from Lieutenant Musgrove went as follows:

Q. [C]ould you relate to the ladies and gentlemen of the jury exactly how you participated in the continued investigation of that shooting?

A. Well, several ways. First of all, we decided to do a paraffin test on [Rowland's] hands to see if there was any type of gunpowder residue. I had him to fill out a consent form, at [sic] which he did fill out, giving us consent to swab his hands.

Q. Okay. And after Mr. Rowland provided his consent to have his hands swabbed, did he respond to you?

A. Yes. His response was "I know a little bit about evidence."

Q. Well, did you ask him whether he knew anything about evidence?

A. No, I didn't. I did not pursue it at that point.

Q. Well, did you tell him we're investigating this case?

A. Well, he knew that we were investigating it.

agent.[15] Spontaneous oral statements are not discoverable as of right under the Rule. *See, e.g., United States v. Scott,* 223 F.3d 208, 212 (3d Cir.2000) (collecting cases); *United States v. Small,* 316 U.S.App. D.C. 15, 24 n. 2, 74 F.3d 1276, 1286 n. 2 (1996).[16] Although the term "interrogation" is not defined in Rule 16, we may assume *arguendo* that it should be accorded an expansive interpretation encompassing not only "express questioning, but also ... any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response ...." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *see Small, supra.* Even so, the record does not support Rowland's claim on appeal that his alleged comment to Lieutenant Musgrove was the product of interrogation. Rowland did not make that claim in the trial court. There he acquiesced in the characterization of his comment as some-

thing he volunteered without being asked. Perhaps his comment was an incriminating "response" to Lieutenant Musgrove's request that he allow his hands to be swabbed, *see* footnote 14, *supra,* but if so, it was an unsought and unforeseeable response, much like the statements at issue in *Scott, supra.*[17]

Rule 16 therefore did not require the government to disclose the comment that Rowland made to Lieutenant Musgrove. As the government did not violate the Rule, no sanction at all should have been imposed, and the trial court certainly did not err in denying Rowland's motion for a mistrial or alternative relief.

### B. Admission of Prior Consistent Statements

■ Three police officers testified that Rowland referred to Hoyle derogatorily as a "bitch" on the night of her death.[18] On cross-examination the officers admitted that their reports that night omitted this fact. Over defense objection, the trial

---

**15.** At the time of Rowland's trial, Rule 16(a)(1)(A) provided in pertinent part as follows:

> Upon request of a defendant the prosecutor shall disclose to the defendant and make available for inspection, copying, or photographing: ... that portion of any written record containing the substance of any relevant oral statement made by the defendant whether before or after arrest *in response to interrogation* by any person then known to the defendant to be a government agent; .... The government shall also disclose to the defendant the substance of any other relevant oral statement made by the defendant whether before or after arrest *in response to interrogation* by any person then known by the defendant to be a government agent if the government intends to use that statement at trial.

(Emphasis added.) Except for minor word changes, the same language appears in the current version of Rule 16(a)(1)(A).

**16.** We construe Rule 16 consistently with the federal rule from which it is derived. *See*

*Davis v. United States,* 623 A.2d 601, 605 n. 12 (D.C.1993).

**17.** The defendant in *Scott* was arrested for possession of a handgun and taken to the police station for processing. When the police directed him to remove certain articles of clothing, he made several statements denying that he had been carrying a gun. Then when he removed his boot, a .45 caliber bullet fell out, "and in response Scott blurted out" an expletive suggesting consciousness of guilt. 223 F.3d at 209. The Third Circuit held that none of Scott's statements were made in response to interrogation for Rule 16 purposes. *Id.* at 212.

**18.** Sergeant Poskus testified that Rowland said to him, "she fucking shot herself ... the bitch shot herself." Sergeant Smallwood testified that Rowland said that what Hoyle did was "fucked up" and "the bitch didn't have to do that." Officer Brooks testified that she heard Rowland say, "That fucking bitch shot and killed herself."

court permitted the prosecutor to rehabilitate two of the officers with their grand jury testimony, in which they did report Rowland's references to Hoyle as a "bitch." Rowland contends that the court abused its discretion in admitting the officers' prior consistent statements before the grand jury when his cross-examination of the officers did not suggest explicitly that their trial testimony was a recent fabrication.

■■■■ The impeachment of a witness with his or her prior *inconsistent* statements (including, as in this case, impeachment by omission) does not open the door to the introduction of any and all prior *consistent* statements that the witness may have made. "[R]epetition does not imply veracity." *Prophet v. United States,* 602 A.2d 1087, 1093 (D.C.1992). Nonetheless, the trial court has "broad discretion" to permit a party to introduce a witness's prior consistent statements (a) to rebut a suggestion of recent fabrication by the witness, if (b) the prior statements were "made at a time when, considering all the circumstances, the witness did not have a motive to fabricate." *Id.* at 1093, 1094 (citations omitted). In this case the court made what it said was a "judgment call" with full awareness of these requirements. While the defense had not accused the officers in so many words of having collusively fabricated their testimony about Rowland's remarks to support a prosecution theory that his behavior after Hoyle died was suspicious, the court found that to be the logical implication of the cross-examination. The court found it improbable that the officers could have had such a motive at the time they testified before the grand jury. Rather, the court reasoned, "if there was any motive to fabricate, it [arose] only after the case was at the point of being tried, where it was clear what the Government's theory was . . . ."

■■■■ The evidentiary issue was a close one that was committed to the trial court's discretion. "An exercise of judicial discretion will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable." *Clayborne v. United States,* 751 A.2d 956, 963 (D.C.2000) (internal quotation marks and citations omitted). There is no such appearance here. On the contrary, the trial court articulated a reasonable assessment of the evidence and correctly apprehended the governing law. We uphold its ruling on the admission of the officers' prior consistent statements in the grand jury.

## C. Admission of Rebuttal Testimony

Rowland next complains that the trial court abused its discretion by permitting the prosecution to present extrinsic evidence in its rebuttal case to impeach Officer Washington and other defense witnesses on collateral matters. Rowland cites the testimony of Sergeant Wagner and others concerning Washington's failure on the night of Hoyle's death to tell the police about her recent suicidal behavior, his offer and refusal to take a lie detector test, and Hoyle's lack of access to the Vice Unit safe. In addition, Rowland cites the testimony of a former girlfriend, Doreatta Garner, that in her presence he had made suicidal gestures of his own (threatening on more than one occasion to shoot himself with his service weapon), and that he had, when he was still seeing her, concealed an intimate relationship he was maintaining with another woman (not Hoyle). Finally, Rowland cites testimony of police witnesses clarifying the informal status of a Vice Unit safety policy that Hoyle had violated, and of Lieutenant Musgrove contradicting an assertion by Rowland's father that the police originally classified Hoyle's death as a suicide.

In a criminal trial, "[t]he purpose of rebuttal is 'to explain, repel, counteract or disprove the evidence' of the accused." *Gregory v. United States*, 393 A.2d 132, 137 (D.C.1978) (citation omitted). "The decision to allow rebuttal evidence is committed to the discretion of the trial judge; we will reverse her decision only for an abuse of discretion." *Fitzhugh v. United States*, 415 A.2d 548, 551 (D.C. 1980). When we undertake to assess the true import of questionable evidence, we owe considerable deference to the superior vantage point of the judge who oversaw the trial; hence "we are disinclined to overturn a trial judge who has determined—after watching a case unfold—that testimony properly rebuts an inference that a party's adversary has sought to make." *Hughes v. United States*, 633 A.2d 851, 852 (D.C.1993) (internal brackets, quotation marks, and citation omitted).

The common law rule to which this jurisdiction still adheres is that "a party may not present extrinsic evidence to impeach a witness on collateral issues." *Patterson*, 580 A.2d at 1322 (citation omitted). If a witness is cross-examined about a matter that is classified as collateral (including, but not limited to, a prior inconsistent statement about a collateral matter), this rule bars the examiner from presenting extrinsic evidence to contradict the witness. This principle is simpler to state than it sometimes is to apply, for there is not always agreement on whether an issue is genuinely collateral. We have stated that a matter is collateral if "it would not have been admissible independently for any purposes other than the contradiction" in the party's case-in-chief. *McClain v. United States*, 460 A.2d 562, 569 (D.C.

1983) (citing treatises); *accord, Clayborne*, 751 A.2d at 972; *Hampton v. United States*, 318 A.2d 598, 600 (D.C.1974). Thus,

> [T]he matter is non-collateral and extrinsic evidence consequently admissible if the matter is itself relevant to a fact of consequence on the historical merits of the case. When the fact is logically relevant to the merits of the case as well as the witness's credibility, it is worth[y] of the additional court time entailed in hearing extrinsic evidence.

MCCORMICK ON EVIDENCE § 49, at 203 (5th ed.1999). This core sense of the term "collateral" does not exhaust its scope, however. Some "linchpin" facts may appear collateral in isolation but yet be so central to a witness's testimony about a material transaction or matter that the probative value of extrinsic impeachment is too great to ignore:

> [T]he extrinsic evidence is non-collateral and again admissible when it relates to a so-called "linchpin" fact. Under this prong of the test, for purposes of impeachment a part of the witness's story may be attacked where as a matter of human experience, he could not be mistaken about that fact if the thrust of his testimony on the historical merits was true.

*Id.* Stated a bit more generally, "evidence technically classified as collateral may be admitted, in the trial court's discretion, provided it has sufficient bearing on the issues which the trier of fact must resolve." *Patterson*, 580 A.2d at 1322–23. This is a concededly vague test, and the trial court's discretion in admitting extrinsic evidence to impeach a witness is "correspondingly broad." *Id.* at 1323.[19]

---

19. In *Patterson* this court also recognized another "exception" to the rule: where the defendant makes a false statement of a specific fact *in his direct testimony*, the trial court has discretion to permit the prosecution to present extrinsic evidence to contradict the defendant *as to that fact,* even if it is otherwise collateral. *Id.* at 1323; *accord, Clayborne*,

We do not agree with Rowland that the trial court abused its broad discretion here. We have already addressed Sergeant Wagner's rebuttal testimony about Officer Washington's offer and refusal to take a lie detector test. Assuming error in the admission of that testimony, we have concluded that the error was harmless. There was no error in admitting extrinsic evidence to impeach Washington on the two other matters Rowland cites. Whether Hoyle had made a suicidal gesture, as Washington testified, was not a collateral matter in this trial, for it bore on whether Hoyle actually did commit suicide in Rowland's apartment as he claimed. The prosecution therefore was entitled to present extrinsic evidence that Washington had made prior inconsistent statements about that matter—including statements on the night of Hoyle's death that were inconsistent because they omitted any mention of recent suicidal behavior on her part. *See Mercer v. United States,* 724 A.2d 1176, 1196 (D.C.1999); *Moss v. United States,* 368 A.2d 1131, 1135 (D.C. 1977); *Hampton,* 318 A.2d at 600. Extrinsic evidence was also properly admitted to impeach Washington's testimony that Hoyle deposited her service weapon in the Vice Unit safe. As we already have observed, this fairly could be viewed as the sort of "linchpin" fact "which as a matter of human experience [Washington] would not have been mistaken about if [his] story were true." *Patterson,* 580 A.2d at 1323 (citation omitted).

Ms. Garner's testimony that Rowland himself had made suicidal gestures with his service weapon similar to the gestures he attributed to Hoyle does not strike us as collateral either. Rather, the trial court reasonably could deem such evidence to be independently admissible on the question whether Rowland was drawing on his own experience to fabricate his claims about Hoyle. Similarly, the status of the Vice Unit safety policy was not collateral either; it was independently relevant (even if only marginally so) to the issue of whether Hoyle's violation of the policy was serious enough to contribute to her supposed despondency.

On the other hand, we think that Garner's testimony about Rowland's dishonesty in his relationship with *her* (not Hoyle) was collateral. The government argues that "whether or not the point was collateral," the trial court had discretion to allow the government to rebut Rowland's "assertion that he had been open and candid in his various relationships" with both women. Inasmuch as Rowland did not make this broad assertion in his direct testimony, *see* footnote 19, *supra,* but only in response to cross-examination, we find this argument less than compelling—though if pressed, perhaps we still might suppress our doubts and defer to the trial court's considered judgment that, under all the circumstances, the matter "had sufficient bearing on the issues" to justify introduction of the rebuttal testimony. *Patterson,* 580 A.2d at 1322. We need not decide that question, however. Although Garner's testimony was unflattering to Rowland, it was so tangential that we are satisfied he suffered no significant prejudice from it. "Given the focus of the trial and the quantity of evidence directly material to the issue of [Rowland's] guilt or innocence, we have difficulty imagining that [Garner's] testimony was of any mo-

751 A.2d at 972. "The rationale behind this rule is not difficult to perceive, for even if the issue injected is irrelevant or collateral, a defendant should not be allowed to profit by a gratuitously offered misstatement." *Patterson,* 580 A.2d at 1323 (quoting *United States v. Beno,* 324 F.2d 582, 588 (2d Cir.1963)).

ment in the jury's deliberations in this case." *Clayborne,* 751 A.2d at 972.

■ Lastly, we come to the testimony that the police never classified Hoyle's death as a suicide, contrary to what Rowland's father said. While this matter too was collateral in our view, it apparently was a distracting side issue that deserved to be put to rest, and the trial court certainly did not abuse its discretion by permitting the government to do that. The testimony did not prejudice Rowland in the slightest.

### D. Improper Examination of Witnesses

Rowland's remaining claim in his direct appeal is that rampant prosecutorial misconduct in the examination of witnesses "obscured and distorted the defense case" and prevented him from receiving a fair trial. Rowland complains that government counsel asked prejudicial questions without having a good faith basis for them, invited one defense witness to comment on the credibility of another, mischaracterized testimony, and badgered defense witnesses by shouting, interrupting, and asking the same question over and over. The government has several responses to what it calls Rowland's "veritable laundry list" of alleged abuses. First, the government denies that its counsel engaged in misconduct. In many instances, the government argues, the questioning was not even improper, let alone unethical.[20] Second, the

government notes, Rowland did not object to some of the conduct of which he now complains. Nor did Rowland ask the trial judge to remedy the pattern of abuse in the prosecutors' questioning that he now perceives. Third, the trial court sustained Rowland's objections to some of the prosecutorial questioning he cites, and he did not request additional or different relief, such as a mistrial. Fourth, in other instances the trial court did not rule on Rowland's objections, and he did not seek a ruling. For all these reasons, the government argues, Rowland is not entitled to reversal on his claim of prosecutorial misconduct.

■ The framework we use for evaluating claims of improper questions or comments by the prosecutor at trial is well-established. If the challenged questions or comments were improper, and the defendant made timely and appropriate objection to them at trial, we must determine whether the defendant suffered substantial prejudice necessitating reversal of his conviction, taking into account such factors as the gravity of the impropriety in context, the centrality of the issue affected by it, the effect of any corrective action by the trial judge, and the strength of the government's case. If the defendant did not object in a proper manner at trial, however, the scope of our review is limited to plain error. *See Clayborne,* 751 A.2d at 968; *McGrier,* 597 A.2d at 41. Under this

---

**20.** This court more than once has cautioned that the charge of "misconduct," implying bad faith and improper motive, "has been applied all too freely, and without serious reflection, to statements made by attorneys—prosecutors and defenders alike—in the heat of a trial, when semantic and stylistic precision are not uppermost in their minds.... [S]ome less sinister name should be given to the rhetorical excesses of attorneys who say what they should not say when engaged in forensic combat." *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991). Not every litigation error deserves the label of misconduct; far from it. Furthermore, an appellant who failed to make timely and apposite objection at trial had best be especially cautious about impugning the integrity of opposing counsel. In the absence of such objection, neither opposing counsel nor the trial court will have had a fair opportunity to address the charge of misconduct, and the record likely will be devoid of the factual inquiry required to support the charge.

framework, Rowland's claims of prosecutorial misconduct do not merit relief.

■■■■ Although Rowland cites numerous instances of allegedly improper questioning, his claims of prejudice are exaggerated. Take, for example, the single most serious instance of which he complains. Rowland argues that the prosecutor attempted—without a good faith basis and, seemingly, in direct violation of a prior ruling by the trial court—to ask a witness if Christie Hoyle had told her during a telephone conversation on the day of her death that Rowland had beaten her in the past. The question (which actually was more ambiguous than Rowland acknowledges) drew an immediate objection from defense counsel. The trial judge sustained the objection and admonished the prosecutor in front of the jury that she had already ruled on the subject, there was "no evidence about the beating and we are not going to go into that!" The witness, who was Hoyle's sister, did not answer the question. The prosecutor then asked a more general question—did Hoyle tell her that she was having "any problems?" The witness said, simply, "No." The matter then was dropped for good, the prosecutor asked no further questions, and the witness was excused. Even if a question about past beatings threatened to plant a false and damaging insinuation and should not have been asked,[21] we are convinced that Rowland did not suffer any significant prejudice. The reference to the possibility of past physical abuse was not pursued, the judge took prompt and forceful corrective action, and the witness herself ultimately negated the adverse implication.

■■■■ Other instances of which Rowland complains strike us as trivial. We need not list them all. To illustrate, Rowland cites two other occasions (in what was a lengthy trial) on which he claims the prosecutor asked questions without a proper foundation. In each instance the questions were tangential and the trial judge intervened to sustain the defense objection and defuse any potential for prejudice.[22] Similarly, Rowland cites a single occasion on which the prosecutor appeared to be asking one defense witness (the expert on suicide) to comment on another defense witness's credibility.[23] But the witness did not answer the question. As Rowland concedes, the trial judge again sustained the

---

**21.** "It is a generally accepted principle that the government may not attempt to manufacture evidence by creating an impression in the minds of the jurors through questions that imply the existence of facts. Questions assuming the existence of a factual predicate must be grounded in a good faith belief that those facts are susceptible to proof by competent evidence." *Ali v. United States,* 520 A.2d 306, 313 (D.C.1987).

**22.** The first instance occurred when the prosecutor was examining a defense expert on suicide about the possible reasons behind Hoyle's medical discharge from the military. When the defense objected to a question implying without foundation that Hoyle was discharged because she had suffered migraine headaches, the judge clarified that the prosecutor was offering a mere hypothetical to the expert. The second instance occurred when

the prosecutor was examining Officer Washington's wife, Patrena Washington, who corroborated her husband's testimony that Hoyle had called him at home and spoken about killing herself. The defense objected when the prosecutor asked Ms. Washington if she ever had been concerned that her husband was "seeing" Hoyle. The judge upheld the objection and the prosecutor agreed not to inquire about Washington's possible infidelity.

**23.** Rowland complains of the following question that the prosecutor put to the defense expert on suicide: "[S]uppose Officer Dwayne Washington tells you, 'I testified, Dr. Berman, in the grand jury, I testified at a prior proceeding and I testified in court on this occasion. And I ironically I[sic] happened to be telling the truth on each occasion although there are various inconsistencies on all three of those testimonies.'"

defense objection and warned the prosecutor that his question was improper.

■ Rowland also complains that the prosecutor mischaracterized his testimony in asking the defense expert how it would affect his opinion if he knew that Rowland had "admitted under oath that he would lie for his own convenience." The trial judge sustained the objection to this question and instructed the prosecutor that he could describe what Rowland had said without "editorializing." The prosecutor then asked the expert witness what he would say if he knew that Rowland had admitted that it was convenient for him to lie to people with whom he was associated. Viewing this as a "generic description" of Rowland's acknowledgment at trial that he had lied to his girlfriends, the judge "permit[ted] it but without any further comment." We see no reason to think that the jury was misled by the prosecutor's characterization of Rowland's trial testimony. Accordingly we see no abuse of discretion in the trial court's ruling.

■ To be sure, the cross-examination of defense witnesses may have been overly aggressive at times, as Rowland contends. Rowland sometimes objected, for example, to the prosecutor's tone of voice or failure to let a witness complete his or her answer. The trial judge sometimes did deem it necessary to caution the prosecutor or rein in the questioning. At other times, Rowland did not object, or the judge exercised her discretion not to intervene. Our sense, though, is that while any excesses on the part of the prosecution were regrettable, they were neither frequent nor egregious. They did not divert attention from the issues and evidence that were material. No defense witness was intimidated, embarrassed, or otherwise mistreated; no defense testimony was cut off, obscured, or distorted. There were no improper appeals to passion or prejudice. For these reasons we are persuaded that the alleged lapses on the part of the prosecution in the questioning of defense witnesses had no effect on the outcome of the trial.

## IV. The Motion for a New Trial

Two years after his trial, Rowland moved pursuant to D.C.Code § 23–110 to set aside his manslaughter conviction on constitutional grounds. Rowland charged that the prosecution had violated his Fifth Amendment right to due process by withholding materially exculpatory information that was contained in documents in the possession of the Metropolitan Police Department. Alternatively, Rowland contended that he was entitled to a new trial under Rule 33 of the Superior Court Criminal Rules because the documents in question constituted newly discovered evidence that probably would result in his acquittal. After extensive litigation and an evidentiary hearing, the trial judge issued a thorough written opinion and order denying relief.

The allegedly exculpatory police documents were generated in connection with internal weapons review and procurement activities of the Police Department. The documents were made available to the parties and the court under seal and are subject to an agreed-upon protective order to preserve the confidentiality of official deliberations. Fortunately, although we have examined the documents ourselves to decide this appeal, we do not need to describe them in detail to do so. Contrary to the trial testimony of firearms expert Larry Melton, *see* footnote 2, *supra,* the documents disclosed that Glock handguns of the type issued to Officer Hoyle were susceptible to accidental discharge. To describe the documents further, it suffices for us to quote the trial judge's non-confi-

dential summary, the accuracy of which is not in dispute: [24]

> The crux of the matter revealed by these documents is that numerous instances of accidental discharges of Glock 9 mm service weapons had been discovered by the Metropolitan Police prior to trial in this case. The documents reveal that the causes were primarily "human error," and in some instances a mechanical problem that has been remedied but which certainly did not afflict Christie Hoyle's service weapon.[25]

A critical point to remember is that none of the "accidental" firings occurred without the trigger being touched or jarred by some type of human movement. In other words, none of the guns involved spontaneously exploded or ejected a bullet all by themselves.

The trial judge also found, and this too is undisputed, that the prosecutors had no knowledge of the police documents prior to trial and only learned of them after Rowland filed his post-conviction motion. None of the authors of the documents was involved in the investigation of Hoyle's death or the prosecution of Rowland; nor is there any indication that Larry Melton was aware of the accidental discharge problem associated with the Glock service weapon when he testified at trial. The documents do reveal, however, that another prosecution expert who testified at Rowland's trial, a civilian firearms identification specialist named Gary Phillips, previously had been informed of the problem. It was Phillips who examined Hoyle's weapon after her death and found it to be functional and not defective. *See* footnote 25, *supra.* Phillips was not asked and did not testify at trial about the safety or reliability of the Glock, however.

In moving for a new trial, Rowland contended that the prosecution should have divulged the police documents revealing the susceptibility of the Glock to accidental firing in their response to his pretrial *Brady* [26] request for exculpatory material. If he had known the information contained in the documents, Rowland explained, "the defense could have argued as an alternative theory of the case that [Hoyle] killed herself by accident [i.e., rather than intentionally] while engaging in another act of threatening to kill herself." [27] This alter-

---

24. We quote the trial judge's main opinion, which is not under seal. The trial judge furnished a helpful in-depth analysis of the documents in a supplemental order from which we do not quote because it is under seal.

25. Hoyle's service weapon was examined early in the police investigation following her death. The examiner found that the weapon functioned properly and that all its safety mechanisms were intact and functional. These findings (which were not brought out at trial) are not disputed.

26. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

27. At first blush, it may appear surprising that, in proposing his alternative theory of an accidental discharge, Rowland retained his premise that Hoyle was making a suicidal

gesture when her gun went off. We think, however, that this linkage was necessary for the alternative theory to be even remotely plausible, given Rowland's testimony of the events leading up to Hoyle's death and the known, incontestable facts. By Rowland's account, Hoyle had no reason to be handling her service weapon at all if she was not using it to threaten suicide; and if Hoyle truly inflicted her fatal wound herself, she had to be pointing the weapon directly at her own chest, which would be inconceivable if it was not a suicidal gesture or attempt.

As he did when litigating his new trial motion in the trial court, Rowland prudently disavows any argument that he could have advanced the defense that Hoyle's weapon discharged accidentally while he and Hoyle were struggling with each other, or that the jury could have acquitted him on that theory. While such a defense would have been consis-

native theory was consistent with Rowland's testimony that he did not see how Hoyle shot herself—it could have been accidental or on purpose. Although Rowland did not explain how he would have placed evidence to support a theory of accidental discharge before the jury, we may presume that he might have elicited testimony about the problems with Glocks from Gary Phillips, since Phillips was aware of the problems and was qualified to testify as a firearms expert.

The trial judge denied a new trial on three principal grounds. First, the judge concluded that the police documents in question "were not recognizably *Brady* material," such that the prosecutors or the police had a duty to turn them over in response to Rowland's general request for exculpatory material. Rowland had not made a specific request for evidence that the Glock could discharge accidentally, and police documents addressing that possibility were "irrelevant" to the suicide defense

that the prosecutors "well knew ... was going to be launched...." Second, the judge concluded that the police documents would not have been admissible at trial in any event, because there was no evidence linking Hoyle's shooting to the sort of mechanical defect or mishandling that the documents reported. On the contrary, the undisputed evidence showed that Hoyle's weapon was "in proper working order," and Rowland could not say how Hoyle handled it. Third, and finally, the judge concluded after a painstaking review of the evidence adduced at trial that even if the police documents had been disclosed to Rowland, there was no reasonable likelihood that the verdict in his case would have been different. The prosecution's case, though circumstantial, was "very strong;"[28] Rowland was "not convincing as a witness" and "did not successfully portray himself to be a wronged man;"[29] the prosecution persuasively rebutted the claim that Hoyle was suicidal;[30] and, the

tent with the account that Rowland allegedly gave to Officer Scott and more compatible with the theory of the prosecution, it was not a realistic option. Rowland would have faced manifold and virtually insurmountable obstacles had he attempted to assert such a defense (beginning with the fact that it would have been contrary to his detailed statement to the police); since he never has, we will not address it further.

28. "Overall," the judge found, "the Government's evidence standing alone was solidly inculpatory," and "the Government's witnesses were credible and convincing." For example, the judge observed,

There was a devastating effect from the recollection of Hoyle yelling for defendant to get off of her, after a lengthy period of fighting or struggling that we know resulted in visible injuries. The two teenagers [Terrence and Michael Harper], though young people, spoke well and presented themselves in an earnest manner on the witness stand. They had no motive to tell lies or inflate what they had heard. If anything,

their testimony most vividly focused the jury on the truth.

Similarly, the judge observed that the Deputy Medical Examiner "was forceful and unwavering in her testimony that eliminated the 'passion mark' suggestion by David Rowland."

29. "Rowland's trial testimony, in the [judge's] view, was manifestly untrue." The judge noted, for example, that "[t]rying to explain the multitude of injuries [that Hoyle had sustained] as passion marks was yet another self-inflicted gaffe by David Rowland. It only served to portray him as a sinister, cynical, and unsubtle person."

30. The judge found that "the Government's rebuttal of the suicide defense was vigorous and credible."

For example, the Government's expert on this subject [police officer suicides and related problems] appeared to be a stronger witness than the defendant's expert, if only because he had actually talked about [Hoyle] with her family. This is very important. The rationale of the Government's

judge observed, other than his "broad and conclusory statement" that he could have argued the alternative theory that Hoyle killed herself by accident, Rowland "has never proffered with any specificity how the documents could have helped avoid a conviction." Indeed, the judge thought, the presentation of a patently speculative accident defense as an alternative to the suicide defense could have backfired, for the jury "easily [could have] interpreted this ploy as a desperate smoke screen. This 'alternative' theory could have trivialized the entire defense at Rowland's trial."

 We are in general agreement with the trial judge. "[T]he suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Because "the rule encompasses evidence known only to police investigators and not to the prosecutor," "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. 263, 280–81, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (internal quotation marks and citations omitted). Favorable evidence is "material" within the meaning of the *Brady* doctrine, however, only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280, 119 S.Ct. 1936 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481

(1985)). Thus, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 282, 119 S.Ct. 1936.

This court has held that "[w]here, as here, the trial court has determined that asserted *Brady* material would not have materially affected the verdict, the reviewing court is limited to a determination of whether that decision was reasonable." *Davies v. United States*, 476 A.2d 658, 661 (D.C.1984) (citing *United States v. Agurs*, 427 U.S. 97, 114, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). However, in *Farley v. United States*, 767 A.2d 225, 228–29 (D.C.2001), we recognized that the highly deferential standard of review that *Davies* mandated may not comport with the standard of review utilized in subsequent decisions of the Supreme Court and other federal courts; *see also id.* at 233–34 (Ruiz, J., dissenting). The *de novo* or "independent" review that *Davies* said was "precluded," 476 A.2d at 661, instead may be required. But as in *Farley*, we find it unnecessary to resolve that question in this appeal. Under either standard of review, we are satisfied that there is no "reasonable probability" that the result of Rowland's trial would have been different if the documents discussing accidental discharge problems with the Glock service weapon had been disclosed to the defense.

Preliminarily, we see little reason to disagree with the trial judge's overall assessment that the prosecution evidence was

expert was very logical, and he effectively wove together the pertinent information about Hoyle's personal life.

The judge noted that the prosecution also presented several lay witnesses who had known Hoyle and who provided details about her personal life "that belied any hint of sui-

cide." "The thrust of their testimony was to establish that despite various ups and downs of life, [Hoyle] was in a hardworking, positive frame of mind at the time of her death and was proceeding with her life in a manner that was inconsistent with a person who wanted to end her life."

strong and the case was not a close one, notwithstanding the facts—emphasized by Rowland—that the evidence against him was circumstantial and his first trial ended with a hung jury. This was not the sort of case in which the scales were balanced so closely that virtually any additional evidence on the side of the defense might have been significant. That said, the following considerations particularly dispose us to find that the undisclosed material in this case was not material.

First, assuming that Rowland might have been able to introduce evidence that Glocks were known to be susceptible to accidental discharge because of mechanical defects or mishandling, the theory that Hoyle accidentally fired her Glock while making a suicidal gesture would have remained speculative at best and contrary to the evidence at worst. There was no evidence that Hoyle's weapon was mechanically defective. The post mortem examination of the weapon ruled out any defects in its safety features. Since Rowland professed not to see Hoyle shoot herself, there likewise was no evidence that she mishandled her weapon or somehow fired it inadvertently. There was, of course, considerable evidence—*e.g.,* the testimony of the Harpers and the abrasion on Hoyle's palm—that undercut that hypothesis. The mere fact that it might have been *possible* for Hoyle's weapon to discharge accidentally was hardly substantial evidence that it *did* fire accidentally under the circumstances of this case.

Second, even under Rowland's alternative "accidental discharge" theory, he still needed the jury to find that Hoyle made a suicidal gesture in his apartment on the night of her death.[31] *See* footnote 27, *supra.* The most plausible interpretation of

the jury's voluntary manslaughter verdict, it seems to us, is that the jury rejected the "suicidal gesture" scenario—in favor, presumably, of the prosecution theory that Rowland physically attacked Hoyle, grabbed her weapon away from her when she tried to defend herself with it, and shot her as they continued to struggle. But evidence that Hoyle's Glock could have discharged accidentally would not have made the rejected "suicidal gesture" scenario any more likely. Nor would the possibility of accidental discharge have rebutted the evidence that Rowland fought with Hoyle, grabbed her weapon, and shot her with it.

We conclude that there is not a reasonable probability that the undisclosed police documents would have produced a different verdict in Rowland's case. His *Brady* claim therefore fails. Our reasoning also dooms Rowland's alternative argument, that the police documents constitute newly discovered evidence entitling him to a new trial under Superior Court Criminal Rule 33. The evidence simply is not "of such a nature that in a new trial it would probably produce an acquittal." *Whitley v. United States,* 783 A.2d 629, 634 (D.C. 2001), *modified,* 796 A.2d 26 (D.C.2002) (quoting *Thompson v. United States,* 88 U.S.App. D.C. 235, 236, 188 F.2d 652, 653 (1951)).

### V. Conclusion

For the foregoing reasons, we affirm Rowland's conviction and the denial of his motion for a new trial.

---

31. Or to put it more precisely, since the prosecution had the burden of proof beyond a reasonable doubt, Rowland still needed the jury to find at least a reasonable possibility that Hoyle made such a gesture.